IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,767

STATE OF KANSAS,
*Appellee*,

v.

HOWARD BARRETT,
*Appellant.*

SYLLABUS BY THE COURT

1.

The "skip rule" is a logical deduction that may support a finding of harmless error when it reasonably applies. But the skip rule does not replace our longstanding harmlessness tests. Instead, the logical deduction inherent in the skip rule is one factor, among many, to be considered as part of the applicable harmlessness test.

2.

Coercive police activity is a necessary predicate to finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 12, 2016. Appeal from Riley District Court; DAVID L. STUTZMAN, judge. Opinion filed June 7, 2019. Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part and the case is remanded with directions.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Steven J. Obermeier*, assistant solicitor general, argued the cause, and *Barry R. Wilkerson,* county attorney, and *Derek Schmidt,* attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: This is a tragic case of severe mental illness. In 2008, Howard Barrett attacked and killed a man who entered his apartment to exterminate bugs. The evidence at trial showed that Barrett suffered from schizophrenia and felt irrationally threatened by the victim. The key question for the jury was whether Barrett's mental condition precluded him from forming a culpable mental state.

In this appeal, Barrett argues the district court committed reversible error when it denied his request for an instruction on imperfect self-defense voluntary manslaughter— an intentional killing done with the unreasonable but honest belief that circumstances existed justifying deadly force. The Court of Appeals held the error was harmless under the so-called "skip rule." We disagree and hold the error is reversible because there is a reasonable probability that it affected the trial's outcome. In so holding, we revisit the skip rule and clarify that it is merely a logical deduction that may be reasonably considered as part of the applicable harmlessness test.

FACTUAL AND PROCEDURAL BACKGROUND

One morning in February 2008, Jeannette Hermann arrived at a small apartment building that she managed in Riley County. She was there to remind residents that an insect exterminator, Tom James, was on his way to treat the apartments. The building was exterminated once a month. As usual, Hermann had notified residents of the extermination by letter and had posted signs around the building a couple days beforehand.

Hermann arrived before the exterminator and began knocking on doors. She worked her way through the building top to bottom, ending with Barrett's apartment in

2

the basement. She knocked loudly on Barrett's door, but he did not respond. So Hermann unlocked Barrett's door, went inside, and hollered that the exterminator was coming. She found Barrett in his bedroom sitting in a lawn chair, where he usually slept. Barrett said something to Hermann, but she did not understand his reply. Then Hermann left to go to the bank. As she left, James was on his way down to the basement apartments.

Hermann was gone about 10 minutes. When she returned to the apartment building, she was surprised to see James' truck still parked outside, so she went inside to find him. She checked Barrett's apartment first, because it was the last one James would have visited. She found James lying on the floor of Barrett's apartment, up against the front door. The door was partially open, but Hermann could not open it further because of James' body. She could not see Barrett but heard him "talking loudly but not really making sense."

Hermann got Barrett's next-door neighbor, Rick Stanley, to help. Stanley called 911 while Hermann waited outside for the police. Stanley told the 911 operator that Barrett attacked the "bug man," and the bug man was bleeding all over. He described Barrett as being "not real right in the head." Stanley later testified that when he peeked inside Barrett's apartment, he saw a man lying on the ground and blood all over the floor. He recalled that Barrett was mumbling incoherently at the time.

Barrett had called 911 just before Hermann arrived. Barrett told the operator that a man entered his apartment unexpectedly, walked into his bedroom, and came at him with a knife, pliers, and a "bug spray thing." Barrett said the man "is lying down here in a pool of blood," "doesn't have much chance of living," and "needs an ambulance and he needs a stretcher." The operator asked Barrett if he harmed the man. Barrett replied that yes, he did, because the man was "asking for a fight and asking for attacking," and Barrett had to defend himself.

Officer Julia Goggins was the first emergency responder to arrive at the scene. She asked Barrett to move James' body so she could get inside the apartment. Then she handcuffed Barrett and asked Stanley to wait with him in the hallway while she attempted lifesaving measures on James. But she soon realized that James was dead.

Law enforcement found two toolboxes and a bug spray unit near James' body. A bloody butcher knife was lying on top of a toolbox, and blood was spattered on the walls. They also discovered a knife set in the hallway leading to Barrett's bedroom. The set was still in its plastic packaging, but one knife was missing. The autopsy later revealed that James sustained five injuries from a sharp object. The two stab wounds to his chest were the cause of death.

Officer Goggins later described the scene as "gruesome": "There was blood on the walls, blood on the tools. It was very chaotic and there was just tools haphazardly tossed around the room. There was just a lot of blood." Officer Goggins did not ask Barrett questions while she investigated, but Barrett "kept saying that he was in his bedroom and when he woke up there was a guy in his apartment." She recalled that Barrett was mumbling a lot and difficult to understand, and she wrote in her report that he might be "mentally handicapped."

Officer Matt Gambrel arrived shortly after Officer Goggins. He took custody of Barrett and placed him in a patrol car. Officer Gambrel advised Barrett of his *Miranda* rights and then began to question Barrett. The interview lasted about five minutes.

Officer Gambrel asked what happened, and Barrett explained that his typewriter broke the night before and he stayed up all night trying to repair it. When Barrett awoke he found a man in his apartment. Barrett said he attacked the man with a knife because the man was in his apartment spraying for bugs without his permission. Barrett admitted that the apartment was sprayed for bugs often and it was possible the man had knocked

4

on his door but he was sleeping too heavily to hear it. Officer Gambrel asked if it was also possible the man was just doing his job, and Barrett said that was possible.

The interview ended when the police captain told Officer Gambrel to stop because a detective would interview Barrett later. At that point, Officer Gambrel stopped asking questions, but Barrett kept talking, mostly about random topics. After a while, Barrett mentioned that he did not want the man to spray his apartment because he was afraid the chemicals would make him more aggressive or less intelligent.

Later that day at the Riley County police station, Detective William Schuck tried to interview Barrett but had significant trouble getting him to focus. The interview lasted about 10 minutes and was captured on video. As Detective Schuck explained the *Miranda* warnings, Barrett kept interrupting, mostly with tangential stories about his life. But he also made several statements about what happened that day. For example, Barrett said he had to protect himself from the person spraying hazardous chemicals and waste in his apartment. He also said the victim "went into my bedroom at me." When Detective Schuck finished the *Miranda* warnings, Barrett asked to speak to an attorney. At that point, Detective Schuck ended the interview.

The State charged Barrett with second-degree intentional murder the next day. When Detective Schuck informed Barrett about the charge, Barrett commented "that he did not shoot anybody" and he "just cut him."

A few days later, defense counsel requested a competency evaluation. The trial was delayed over six years because Barrett was not competent to stand trial. During that time, Barrett was civilly committed twice. The first time, Barrett was civilly committed until June 2010. That summer, the district court found Barrett competent to stand trial, but it was short-lived. In July 2010, Barrett refused to take his antipsychotic medication

5

in jail, and his competency deteriorated. By spring 2011, the court found Barrett was incompetent again and civilly committed him a second time.

Before trial, Barrett filed two motions relevant to this appeal: (1) a motion to suppress the statements he made to law enforcement after receiving the *Miranda* warnings, and (2) a motion to dismiss the case on constitutional speedy trial grounds. In his motion to suppress, Barrett claimed his mental illness made his post-*Miranda* statements involuntary. The district court held a hearing where Officer Gambrel and Detective Schuck testified for the State and a psychiatrist testified for the defense. In the end, the court denied the motion, holding that Barrett's mental illness did not render his statements involuntary, absent evidence of coercive police activity.

The district court also held a hearing on Barrett's motion to dismiss. Defense counsel argued the State's failure to force-medicate Barrett when he refused to take his antipsychotic medicine in jail caused his incompetency, and thus the delay, after July 2010. Testimony established that Barrett refused his medication in July 2010; the jail did not force-medicate him; and the lack of medication likely caused him to lose his competency. However, the district court rejected Barrett's forced-medication argument and held his constitutional speedy trial rights were not violated because his incompetency caused the delay.

The case finally went to trial in November 2014. The parties did not dispute that Barrett killed James; that Barrett was suffering from untreated schizophrenia at the time of the killing; and that Barrett had been hospitalized for his mental illness before. Indeed, the expert witnesses agreed that Barrett had schizophrenia, which is "a psychotic disorder that is characterized by disturbance in thinking" or "broken thoughts." As one expert described, a person with schizophrenia often cannot "understand reality from non-reality" and suffers from hallucinations, delusions, or paranoia.

6

Thus, the key question for the jury was whether a mental disease or defect prevented Barrett from forming a culpable mental state. See K.S.A. 22-3220 ("It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged."). To answer this question, the parties presented an array of lay and expert witnesses to opine on Barrett's mental condition.

Hermann and a local banker, Anita Bassett, testified about their interactions with Barrett before the killing. Hermann explained that she had trouble understanding what Barrett said and that he exhibited odd behaviors, like taking apart appliances in his apartment. Bassett interacted with Barrett at the bank and around town. She recalled that Barrett told farfetched stories about his past, threw rocks at people, and showed signs of paranoia.

The defense presented two expert witnesses. Dr. William Albott, a clinical psychologist, examined Barrett in February 2008 and February 2011. He testified that schizophrenic conditions are not "steady states"; instead, a person with schizophrenia can make a coherent statement one hour and an incoherent one the next. He explained that forming criminal intent requires "some utilization of critical functioning, of critical judgment" but people with schizophrenia are "almost operating on raw instinctual urges." But, he added, they can form intent to start tasks.

Dr. Albott reported that in 2008, Barrett was "disorganized, nonresponsive to most of my interview questions"; his "thinking was tangential at best, rambling"; and he "did not make any sense." Dr. Albott believed that Barrett "probably popped out of his sleep state in a very disorganized manner" and was "maybe even floridly psychotic at that moment." Moreover, Dr. Albott hypothesized, Barrett's belief that someone tried to spray harmful chemicals at him could be part of his delusional paranoia. Ultimately, Dr. Albott

7

concluded that during the killing "[Barrett's] functioning was psychotic, and . . . he would not have a firm grasp on the realities that you and I might use to organize our lives."

Dr. Bradley Grinage, a forensic psychiatrist, examined Barrett a few months before trial. At that time, he believed Barrett was competent to stand trial because of medication. He testified that Barrett reported having auditory and visual hallucinations and showed signs of paranoid delusions that people were out to hurt him. However, Dr. Grinage disagreed with Dr. Albott about the vacillating nature of schizophrenia. Instead, he explained, "[I]f a person has an active psychotic process, it's not like you are going to be cogent and thinking one minute and psychotic the next and then back. . . . [P]sychotic patients, unless it's drug induced, will stay in their acute psychotic phase until treated."

Dr. Grinage concluded that Barrett's actions were driven by the "kind of psychotic non-reality" that "puts the person a slave to that particular thought process and does not allow a willful, conscious desire." As Dr. Grinage explained, "[A] psychotic state like that robs a person of being able to make conscious, subjective decision or intention." He suggested there was no rational explanation for Barrett taking actions to defend himself—other than Barrett being psychotic and paranoid.

The State called Dr. William Logan, a psychiatrist, in rebuttal. Dr. Logan interviewed Barrett a few months before trial and reviewed his medical history. In his opinion, Barrett showed the capacity to form intent. For example, Barrett proved he was capable of planning activity because he was living independently; he called 911 and gave an accurate description of the victim and the circumstances; and he acknowledged that he had harmed the victim. Dr. Logan believed that Barrett's retrieval of the knife "indicates purposeful activity. [It was significant] not only that he got the knife but that he used it." Also, Dr. Logan explained, Barrett knew what was going on and why he harmed the man—he knew the man was there to exterminate bugs, and he did not want him spraying the apartment.

Thus, Dr. Logan concluded, although Barrett was "actively symptomatic" at the time, "there was nothing to indicate that [Barrett] was responding to command hallucinations or delusions that this individual in fact had it out for him in some unusual way. He said in fact the man was just doing his job." And, "despite some irrational thinking, there was also, at least in regard to this act, a fair amount of thinking that was intact."

The district court instructed the jury on intentional second-degree murder, reckless second-degree murder, and involuntary manslaughter, as well as the mental disease or defect defense. Defense counsel requested a voluntary manslaughter instruction, but the court denied it. The jury found Barrett guilty of reckless second-degree murder.

Barrett appealed, claiming the district court erred when it: (1) failed to give an imperfect self-defense voluntary manslaughter instruction; (2) denied his motion to suppress his post-*Miranda* statements; and (3) denied his motion to dismiss on constitutional speedy trial grounds. The Court of Appeals upheld the denial of the motion to suppress and the motion to dismiss. But the panel held the district court erred when it failed to give the voluntary manslaughter instruction. The panel majority determined this instructional error was harmless under the so-called "skip rule" because Barrett's conviction for *reckless* second-degree murder "logically foreclose[d] the possibility of a conviction for imperfect self-defense voluntary manslaughter," which required an *intentional* killing. *State v. Barrett*, No. 113,767, 2016 WL 4262478, at *15 (Kan. App. 2016) (unpublished opinion). Judge Arnold-Burger dissented on this point, arguing the skip rule should not be applied here and the error was reversible. 2016 WL 4262478, at *18 (Arnold-Burger, J., dissenting).

We granted Barrett's petition for review of all three issues.

9

*The district court committed reversible error when it failed to give an imperfect self-defense voluntary manslaughter instruction.*

Barrett argues the district court committed reversible error when it denied his requested jury instruction on imperfect self-defense voluntary manslaughter. He claims the evidence reasonably showed he irrationally but honestly believed that a man was attacking him and he needed to defend himself. We agree a jury question was presented.

Generally, an appellate court reviewing a jury instruction challenge must determine whether the issue was preserved; whether the instruction was legally and factually appropriate; and whether any error was harmless. See, e.g., *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016). Following this well-trod path, the panel held that (1) Barrett preserved the issue for review; (2) the district court erred when it omitted the imperfect self-defense voluntary manslaughter instruction; and (3) the error was harmless because of the skip rule. See 2016 WL 4262478, at *11-15. The panel's first two holdings are not before us because the State did not petition them for review. See *State v. Torres*, 308 Kan. 476, 481-82, 421 P.3d 733 (2018) ("[T]his court generally does not consider issues not raised in a petition for review or cross-petition."); Supreme Court Rule 8.03(i)(1) (2019 Kan. S. Ct. R. 53). Thus, our review is limited to the last and only contested holding—whether the error is reversible.

At oral argument, the parties agreed that the statutory harmless error standard applies. So "the burden of demonstrating harmlessness is on the party benefitting from the error. That party must show there is no reasonable probability the error affected the trial's outcome in light of the entire record." *State v. Preston*, 294 Kan. 27, Syl. ¶ 3, 272 P.3d 1275 (2012); see K.S.A. 60-261; *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). Given this, the precise question becomes:  Has the State proven there is no

reasonable probability that the failure to give an imperfect self-defense voluntary manslaughter instruction affected the trial's outcome? We conclude the State has not met this burden, and, in reaching this decision, we revisit the "skip rule."

Originally, we described the skip rule this way: "'When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured.'" *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004) (adopting the rule and coining the term for the first time in Kansas), *overruled on other grounds by State v. Neighbors*, 299 Kan. 234, 328 P.3d 1081 (2014). But in recent years, we clarified that the skip rule is not, in fact, a hard and fast rule. Instead, it is "'simply a logical deduction that *may* be drawn from jury verdicts in *certain* cases.'" (Emphasis added.) *State v. Plummer*, 295 Kan. 156, 169, 283 P.3d 202 (2012). Moreover, we cautioned courts to make this deduction only where it "reasonably (as opposed to mechanically) applies." *Williams*, 303 Kan. at 600; see *State v. Pulliam*, 308 Kan. 1354, 1370, 430 P.3d 39 (2018) (declining to "mechanically apply the skip rule").

For example, in *Plummer* we declined to apply the skip rule automatically "whenever a jury has rejected a higher severity level lesser included offense in favor of the charged crime" because:

> "Such an application would essentially condone a district court's failure to instruct on a less severe lesser included offense for which there was 'some evidence,' even though the statute says that a 'judge shall instruct the jury as to the crime charged and *any* such lesser included crime.' (Emphasis added.) K.S.A. 22-3414(3). There is no readily discernible reason for a court-made rule which would emasculate the clear statutory mandate to instruct on all lesser included offenses that are supported by the evidence." 295 Kan. at 169.

11

In other words, the skip rule isn't a "rule" at all—it is a logical deduction that may support a finding of harmless error, along with the record in a particular case.

Here, the district court instructed the jury on intentional second-degree murder, reckless second-degree murder, and reckless involuntary manslaughter. But the court denied Barrett's request for an instruction on imperfect self-defense voluntary manslaughter, a lesser included offense of intentional second-degree murder. See, e.g., *State v. Sims*, 308 Kan. 1488, 1499, 431 P.3d 288 (2018). At the time of the crime, imperfect self-defense voluntary manslaughter was defined as "the intentional killing of a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified deadly force." K.S.A. 21-3403(b). Ultimately, the jury found Barrett guilty of reckless second-degree murder.

The panel majority adopted the State's skip rule argument that "in order for the jury to have found Barrett guilty of imperfect self-defense voluntary manslaughter, the jury would have been required to find that the killing was intentionally done—a finding logically inconsistent with the jury's verdict finding Barrett guilty of reckless second-degree murder." *Barrett*, 2016 WL 4262478, at *14. The majority's approach was mathematical—it reasoned that if the jury already subtracted intent from the equation by rejecting intentional second-degree murder, then there was no intent left to support a conviction for a lesser intentional homicide. See 2016 WL 4262478, at *15. Along the way, the majority substituted the skip rule for a full harmlessness analysis.

But the skip rule is not a replacement for our longstanding harmlessness tests. See *State v. Lowery*, 308 Kan. 1183, 1216, 427 P.3d 865 (2018) (affirming that jury instruction challenges raised for the first time on appeal are reviewed for clear error); *State v. Ward*, 292 Kan. 541, 565-66, 256 P.3d 801 (2011) (defining the statutory and constitutional harmlessness tests). And it is not an automatic harmlessness pass. Instead, the logical deduction inherent in the skip rule is one factor, among many, to be

12

considered as part of the applicable harmlessness test. In her dissent, Judge Arnold-Burger traced the history of the skip rule and correctly noted that we have often discussed the rule along with finding the evidence was insufficient to support the disputed instruction. 2016 WL 4262478, at *16 (Arnold-Burger, J., dissenting); see, e.g., *State v. Engelhardt*, 280 Kan. 113, 135-36, 119 P.3d 1148 (2005). We clarify today that for a jury instruction challenge, the touchstone of reversibility is the applicable harmlessness test. To the extent prior decisions have suggested otherwise, we provide the necessary corrective today.

Moreover, the skip rule is not amenable to mechanical (or mathematical) application because—as jury nullification and inconsistent verdicts suggest—juries can play a mitigating role in complex cases, such as this. As Judge Arnold-Burger astutely observed, an imperfect self-defense voluntary manslaughter instruction would have served as an alternative to the mental disease or defect defense, and the evidence could have reasonably supported either theory. *Barrett*, 2016 WL 4262478, at *17-18 (Arnold-Burger, J., dissenting). In other words, on the spectrum from an intentional second-degree murder verdict to a mental disease or defect acquittal, an imperfect self-defense voluntary manslaughter verdict would have fallen somewhere in the middle. In that scenario, the jury could have reasonably concluded that Barrett's mental illness affected his intent but did not negate his culpable mental state entirely.

We hold the failure to give the imperfect self-defense voluntary manslaughter instruction was not harmless because there is a reasonable probability that it affected the outcome of Barrett's trial. At trial, no one disputed that Barrett was suffering from untreated schizophrenia when he killed James. That much was clear. The key question was whether Barrett's mental illness prevented him from forming a culpable mental state. Under the definition applicable to Barrett, imperfect self-defense voluntary manslaughter was not just an intentional murder, but one based on "an unreasonable but honest belief that circumstances existed that justified deadly force." K.S.A. 21-3403(b). And the jury

13

heard plenty of evidence that Barrett was unreasonably but honestly afraid that James was attacking him with harmful chemicals and tools.

For example, Barrett told the 911 operator that the man was asking for an attack, and he needed to defend himself. This is Barrett's first documented reaction to the crime, minutes after it occurred. Barrett also told Officer Gambrel that he was afraid the chemicals sprayed would harm his intelligence or make him more aggressive. Then Barrett insisted to Detective Schuck that "somebody just attacked me in the apartment" and "went into my bedroom at me." Experts later testified that Barrett suffered from persecution paranoia.

Thus, without an imperfect self-defense voluntary manslaughter instruction, "[t]he jury here was deprived of that critical aspect of the relevant criminal law and would not have been able to consider the requisite mitigation with respect to intentional second-degree murder." 2016 WL 4262478, at *18 (Arnold-Burger, J., dissenting). This error is reversible because the jury could have reasonably convicted Barrett of voluntary manslaughter. As a result, we reverse and remand for a new trial.

*The district court did not err when it denied Barrett's motion to suppress.*

Next, Barrett argues the district court erred when it denied his motion to suppress the statements he made after Officer Gambrel gave him the *Miranda* warnings because his mental illness rendered them involuntary. Precisely, he claims these statements were involuntary because he was in a psychotic state and could not understand what was going on at the time. He does not resurrect the other arguments for suppression that he made in the Court of Appeals. The State concedes that Barrett preserved the objection below.

We use a bifurcated standard to review a district court's denial of a motion to suppress: "We review factual findings for substantial competent evidence and exercise

14

unlimited review over the ultimate legal conclusions." *State v. Mattox*, 305 Kan. 1015, 1053, 390 P.3d 514 (2017).

At the suppression hearing, Officer Gambrel and Detective Schuck testified about their interactions with Barrett. Officer Gambrel interviewed Barrett for five minutes in his patrol car outside the apartment building. Officer Gambrel recalled that Barrett was not upset, his demeanor was "pretty calm," and he did not appear to be under the influence of any substance. Officer Gambrel testified that Barrett made some strange statements but otherwise spoke coherently. Officer Gambrel also recalled that he read the *Miranda* rights aloud to Barrett, and Barrett acknowledged that he understood them. Then Barrett agreed to speak with Officer Gambrel.

Detective Schuck testified that he tried to interview Barrett for 10 minutes, but he had difficulty advising Barrett of his *Miranda* rights because Barrett kept interrupting with tangents about his life and comments about the killing. The video of the interview shows that Barrett was talking almost nonstop. When Detective Schuck finally finished explaining the *Miranda* rights, Barrett asked to speak to an attorney. At that point, Detective Schuck stopped asking questions and sent Barrett to the jail.

Dr. Grinage testified for the defense. He had reviewed Barrett's medical history and watched the interview with Detective Schuck. Dr. Grinage concluded that in the video, it was clear that "this defendant certainly could not know or understand or perceive what was going on around him such that he did not have the capacity to knowingly, intelligently, voluntarily waive his *Miranda* warnings." He believed that Barrett's statements were not the product of free will but of "an active, broken thought process."

The district court discussed these testimonies at length in its order denying Barrett's motion to suppress. The court found that "the only actual interrogation was the Gambrell [*sic*] interview conducted in his patrol car"; at that time, Barrett was calm; and

15

there was no evidence suggesting he had difficulty comprehending the questions or responding appropriately. But the court found that Barrett's "apparent comprehension and lucidity deteriorated" between the time Officer Gambrel gave him the *Miranda* warnings and Detective Schuck tried to interview him at the station. Finally, the court found there was no evidence of coercive police activity.

We conclude these findings accurately reflect the record and are backed by substantial competent evidence. The district court apparently gave greater weight to Officer Gambrel's testimony than to Dr. Grinage's testimony. But this court "do[es] not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact," and it "accept[s] as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court." *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

The legal question at hand is whether Barrett's post-*Miranda* statements were voluntarily made. The State bears the burden to prove the voluntariness of Barrett's statements by a preponderance of the evidence. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013). "The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused," based on the totality of the circumstances. *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 2, 106 P.3d 39 (2005). In this inquiry, we generally consider the following nonexclusive voluntariness factors:

> "(1) the defendant's mental condition; (2) the duration and manner of the interrogation; (3) the defendant's ability on request to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's fluency with the English language. Any one factor or a combination of factors may show that the defendant's statement was involuntary under the totality of the circumstances. [Citations omitted.]" *State v. Walker*, 308 Kan. 409, 421-22, 421 P.3d 700 (2018).

16

But here, Barrett contests just one factor: his mental condition. Thus, we must determine whether Barrett's mental state, alone, rendered his statements involuntary.

Barrett claims his post-*Miranda* statements were involuntary because he was "'insane and incompetent'" when he confessed, like the defendant in *Blackburn v. Alabama*, 361 U.S. 199, 207, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960). In *Blackburn*, the defendant suffered from schizophrenic psychosis and committed a robbery during a period of unauthorized absence from a mental hospital. After his arrest, an Alabama court declared him to be insane and hospitalized him for treatment. At trial four years later, the defendant lodged an insanity defense and contested the voluntariness of his confession. Experts opined that the defendant was insane when he confessed. And the evidence revealed that law enforcement interrogated the defendant for 8-9 hours, and eventually, the sheriff drafted the written confession the defendant signed.

The United States Supreme Court held the defendant's confession was involuntary for two main reasons. One, "the evidence indisputably establishe[d] the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed." 361 U.S. at 207. And two:

> "[W]hen the other pertinent circumstances are considered—the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; the composition of the confession by the Deputy Sheriff rather than by Blackburn—the chances of the confession's having been the product of a rational intellect and a free will become even more remote and the denial of due process even more egregious." 361 U.S. at 207-08.

But *Blackburn* is readily distinguishable from the facts before us. As our Court of Appeals persuasively explained:

17

"In the present case, Barrett was capable of independent living at the time he committed the offense for which he was convicted. The interview of Barrett conducted by Gambrel in his squad car, as well as the interview conducted at the police station, was relatively brief in comparison to the 8- to 9-hour interrogation in *Blackburn*. Finally, the statements that were admitted during Barrett's trial were Barrett's oral statements, not a written confession prepared by law enforcement and signed by the accused as in *Blackburn*. In short, the facts of this case are a long way from the egregious facts present in *Blackburn*." *Barrett*, 2016 WL 4262478, at *9.

In addition, the State directs us to a more recent Supreme Court case, *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), which is controlling. In *Connelly*, the defendant walked up to a police officer and said he murdered someone and wanted to talk about it because his conscience was bothering him. The officer gave the defendant the *Miranda* warnings, and the defendant confessed to the crime. The next day, the defendant became disoriented and talked about voices directing him to confess; the evidence later showed that the defendant was receiving command hallucinations. The Colorado Supreme Court held the confession was involuntary on this basis.

The United States Supreme Court reversed, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." 479 U.S. at 167. The Court clarified that *Blackburn* did not rule that a deficient mental condition automatically renders a confession involuntary. Instead, *Blackburn* recognized that "police overreaching" was an "integral element" to finding that a confession was involuntary. 479 U.S. at 164. Thus, the Court declared that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." 479 U.S. at 165.

We have recognized *Connelly* as controlling precedent. See *Randolph*, 297 Kan. at 330 (citing *Connelly* for the rule that "it is well established that low intelligence alone

18

does not preclude a finding that an accused knowingly and voluntarily waived his or her *Miranda* rights"); *State v. Brown*, 286 Kan. 170, 173, 182 P.3d 1205 (2008) ("In *Connelly,* the Court held that coercive police activity is necessary for finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment."). The district court was thus correct to follow *Connelly* and look for evidence of coercive police activity. Finding none, the district court ruled that Barrett's post-*Miranda* statements to police were voluntarily made. We agree. Barrett's statements were not rendered involuntary based on his mental condition alone, in the absence of coercive police activity. Therefore, we affirm the denial of his motion to suppress.

*Barrett's constitutional speedy trial rights were not violated.*

Lastly, Barrett claims the State's failure to force-medicate him, or at least do something more to medicate him, when he refused his antipsychotic medication in jail caused the trial to be delayed another four years, which violated Barrett's constitutional speedy trial rights. Though his road to trial was long, Barrett only contests the part from July 2010-onward, when he refused his medication in jail. After that, Barrett's competency deteriorated and he was civilly committed a second time, until he was competent to stand trial in 2014.

In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court set forth a four-factor balancing test to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530; see *In re Habeas Corpus by Snyder*, 308 Kan. 615, 619, 422 P.3d 1152 (2018). Here, the parties focus on one factor: the reason for the delay. As to the remaining factors, Barrett did not assert his right until the eve of trial, in September 2014, and the State admits that the length of delay is presumptively prejudicial.

19

We assume without deciding that the length of delay and prejudice factors weigh in Barrett's favor. But even so, we conclude Barrett's constitutional speedy trial rights were not violated because the sole reason for the delay after July 2010 was Barrett's incompetency. As we recently held in *Snyder*, "Delays attributable to a defendant's incompetency to stand trial do not infringe upon his or her Sixth Amendment speedy trial rights." 308 Kan. 615, Syl. ¶ 2. To circumvent this, Barrett argues the State bore the burden to maintain his competency by either force-medicating him or by giving him some other, unspecified, medical attention.

In district court, defense counsel argued the State should have force-medicated Barrett to maintain his competency in jail, citing *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), in support. In that case, the defendant was hospitalized at a treatment facility and refused the antipsychotic medicine necessary to make him competent for trial. The facility staff then sought permission to administer the medication against his will. On appeal, the United States Supreme Court recognized that defendants have "a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" 539 U.S. at 178 (quoting *Washington v. Harper*, 494 U.S. 210, 221, 110 S. Ct. 1028, 108 L. Ed. 2d 178 [1990]). That said, the Court held a state could force-medicate a defendant under certain narrow circumstances:

> "[T]he Constitution *permits* the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." (Emphasis added.) 539 U.S. at 179.

By its own terms, *Sell* does not stand for the rule that a state *must* force-medicate a defendant to maintain his or her competency for trial. On the contrary, *Sell* holds that a

20

state *may* involuntarily medicate an incompetent defendant under narrow circumstances. We also agree with the State that "[t]he clear underpinning[] of *Sell* is that courts should proceed with caution before interfering with a person's liberty interest in refusing medication." And even more so here. Dr. Grinage testified about the dangerous, even life-threatening side effects from the medicine Barrett was taking. We reject the notion that the Sixth Amendment required the State to force-medicate Barrett with potentially life-threatening medication to maintain his competency to stand trial.

Barrett also argues, for the first time on appeal, that the State should have, at least, provided Barrett with more medical attention to help him take his medication. But we decline to speculate what more the State could have done without an evidentiary record on this point and without adequate briefing. See *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 (2012) ("The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error."); see also *Nguyen v. State*, 309 Kan. 96, 108, 431 P.3d 862 (2018) ("Our general rule is that an issue not raised or briefed is deemed waived and abandoned."). Therefore, we affirm the denial of Barrett's motion to dismiss on speedy trial grounds.

In sum, we affirm the denial of Barrett's motion to suppress and his motion to dismiss. But we reverse and remand for a new trial because the district court failed to instruct the jury on imperfect self-defense voluntary manslaughter.

Affirmed in part, reversed in part, and remanded with directions.