IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,747

STATE OF KANSAS,
*Appellee*,

v.

MARVIN L. GRAY,
*Appellant*.

SYLLABUS BY THE COURT

1.

The decision to review an unpreserved claim under an exception is a prudential one. Even if an exception would support a decision to review a new claim, this court has no obligation to do so.

2.

Kansas courts presume jury members follow instructions, including limiting instructions regarding the admission and use of prior crimes evidence.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed February 28, 2020. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause, and *Sam Schirer*, of the same office, was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

1

The opinion of the court was delivered by

ROSEN, J.:  A jury convicted Marvin Gray of first-degree premeditated murder, rape, and aggravated burglary. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 2015, Michael Rolle was working in Dodge City. Sometime around midnight, he spoke on the telephone with his girlfriend, C.R., who lived in Wichita. Rolle then spent the night in his Dodge City office. Early the next morning, Rolle contacted C.R. by phone but did not hear a response. He texted her around 5:55 a.m. and again received no response. Rolle continued with his work day before eventually leaving and driving to Wichita.

When Rolle arrived in Wichita, he went directly to C.R.'s house. Upon pulling up in C.R.'s driveway, Rolle noticed that one of the windows on the house was cracked. When he knocked on the door, C.R.'s three-year-old daughter, M., said through the door that it was locked. M. unlocked the door and Rolle entered the house. M. told Rolle that her mother was in the bathtub. When Rolle reached the bathroom, C.R. was leaning forward in the bathtub, unresponsive and unclothed from the waist down. Rolle grabbed C.R. by the shoulder and her body floated up in the water. Rolle immediately called the police.

Police officer Jared Henry was on duty in Wichita on the evening of June 25. At 6:33 p.m., he received a call from dispatch about a stabbing at C.R.'s residence. He and his partner responded to the scene. Henry observed C.R. lying on her back in the bathtub in approximately 6 inches of dark-colored water with her knees up to her chest. After

2

clearing the house, Henry interviewed Rolle. At trial, Henry would describe Rolle as "visibly upset" and "very forthcoming."

Officers executed a search warrant at C.R.'s residence the same night. They noticed a section of glass missing from one of the windows and glass fragments below the window inside and outside of the house. The blinds in the window were askew. There was a chair against the wall next to the window, and there appeared to be spots of blood on the inside of the blinds and on the chair. In the bathroom, officers observed disturbed bathmats in front of the bathtub, hygiene products, toys, and clothes on the floor, and blood along the edge of the bathtub and the sink counter. C.R. was lying in the bathtub in water that appeared to be mixed with blood. There was a chemical odor in the air. In M.'s room, officers found a towel with blood on it, a pair of women's underwear, and a pair of women's shorts. The shorts smelled of urine and had blood stains on them. Officers found a child's blanket with blood on it on the living room sofa.

Chemical tests indicated that there was trace blood on the bathtub, throughout the bathroom, outside of the bathroom, through the hallways, and in M.'s room. There was evidence someone had cleaned blood from one of the hallways.

Dr. Timothy Gorrill performed an autopsy on C.R. The autopsy revealed 37 stab wounds and signs of asphyxiation. Dr. Gorrill would later testify that the cause of death was the stab wounds, that the manner of death was homicide, and that the asphyxiation, which may have been caused by strangling, occurred when C.R. was still alive. A toxicology report indicated that C.R. had methamphetamine in her body when she died. The toxicology report was negative for alcohol and cocaine.

3

Police began interviewing C.R.'s family and friends immediately after discovering her death. A specialist trained in interviewing children spoke with M. Although it is possible she witnessed her mother's murder, M. could not provide any information regarding C.R.'s death. Rolle reported being outside of Sedgwick County for 24 hours before traveling to Wichita on June 25. Police were able to verify his whereabouts through witnesses and video surveillance and consequently ruled Rolle out as a suspect.

Upon checking C.R.'s phone records, police learned that Gray had been in contact with C.R. by phone on June 24. Police interviewed Gray at a residence in Wichita on the night of June 26. Gray told officers that he and C.R. had gone shopping at a mall on the evening of June 24. After they went shopping, the two went to a friend's house located on Cottonwood Street, drank alcohol and did cocaine, and then had vaginal and anal intercourse in an alleyway outside by the car. Gray told officers that C.R. then went home, that he stayed at the house on Cottonwood, and that he did not see C.R. again. Officers photographed a cut on Gray's hand, which Gray described as a work injury.

Surveillance cameras at the mall confirmed that C.R. and Gray had gone shopping together in the evening on June 24. But further evidence disproved other aspects of Gray's story. Video surveillance from a car dealership near the Cottonwood house revealed that Gray and C.R. never had sex in an alleyway by the Cottonwood house. The video also revealed that Gray left the Cottonwood house on foot around 1:30 a.m. on June 25 and returned on foot around 8 a.m. the same day. Cell phone records showed Gray's cellphone in the area of C.R.'s residence around 4:49 a.m.

Forensic testing eventually confirmed that Gray had been in C.R.'s residence. It indicated that the blood on the window blinds and the chair by the window, some of the blood on the shorts, and some of the blood in the bathroom came from Gray. Testing also

4

revealed Gray's semen on the inside and outside of the underwear found in M.'s room and on a vaginal swab taken from C.R.'s body. Gray's DNA was identified on some of the bathroom toiletry bottles. The testing also indicated that the blood from the blanket, the living room floor, the outside of the underwear, the towel, M.'s room, and the rest of the blood on the shorts and in the bathroom came from C.R. Forensic analysis revealed Gray's handprints and fingerprints on the outside of the broken window.

After the evidence discredited parts of Gray's story, officers interviewed him again at the police station. During this interview, Gray relayed a story that was different from the one he originally provided. Notably, Gray informed officers that he had been at C.R.'s house early in the morning on June 25 and that they had consensual vaginal and anal sex in the bathroom at her house. This interview was eventually played for the jury.

Based on the compiled evidence and his new statement, the State charged Gray with premeditated first-degree murder, rape, aggravated criminal sodomy, and aggravated burglary with the intent to commit a sexually motivated crime.

In a pretrial motion, the State asked the court to admit under K.S.A. 60-455 evidence that Gray had committed three prior attempted or completed rape offenses in 2006, 2010, and 2013. Gray objected to the admission of this evidence. The district court denied the State's motion with respect to the 2006 evidence but granted the motion as it related to the 2010 and 2013 evidence.

At trial, the State offered evidence of only the 2013 incident. A woman testified that Gray had strangled and raped her in 2013. The sexual assault nurse who examined the woman after the alleged rape also testified. She stated that the woman presented to the hospital with injuries consistent with strangulation and rape. A witness for the defense

5

testified that she had been present during the alleged rape and that it looked to her like consensual sex between Gray and a woman who had come to her house to smoke marijuana.

The jury was instructed that it could only consider evidence of the alleged 2013 rape as evidence of Gray's intent to commit rape and aggravated criminal sodomy in the current case.

Gray testified in his own defense at trial. He stated that he and C.R. had been friends since they were 11 or 12 and had hung out together regularly since that time. Around 3 p.m. on June 24, C.R. picked Gray up at his mother's house and the two of them then picked up C.R.'s daughter and returned to C.R.'s house. C.R. put M. in the bathtub to bathe and then snorted some cocaine with Gray. Before going to take a bath herself, C.R. told Gray to open the curtains and let some light into the house. Gray stood on a chair next to the front window to move the curtains, and his nose began to drip blood. He stopped the blood with a tissue and eventually flushed the tissue and wiped the blood from his face and hands in the bathroom. After dropping M. off at C.R.'s mother's house, C.R. and Gray drank alcohol while driving to the mall. They shopped until about 8 p.m. and then went to Gray's friend's house on Cottonwood. Gray had been living with his brother just a few houses over. At his friend's house, Gray and C.R. drank and did cocaine. Around 10 p.m., C.R. left to pick up her daughter. C.R. invited Gray to come with her, but he decided to stay and said he would come over to C.R.'s house later.

Gray further testified that sometime later, he began walking to C.R.'s house. At some point, a stranger drove him part of the way. Gray knocked on C.R.'s front door upon arriving at her house. When C.R. did not answer, Gray went to look in her window. Gray testified that the window was not broken. C.R. eventually opened the front door and

6

let Gray in. C.R., and Gray did some cocaine and then Gray asked her if she wanted to have sex. C.R. agreed, did some more cocaine, and then went to check on M. C.R. then directed Gray to the bathroom and told him they could have sex in there. She and Gray had vaginal and anal sex, with C.R. leaning over the bathtub and Gray behind her. After this, Gray left. He went to a friend's house to sleep and eventually returned to his brother's house. He slept until about 5 p.m. and then went to work at Olive Garden until about 10 p.m. where he cut his hand on a steak knife. On his way home from work, he learned from friends that C.R. had died.

During his testimony, Gray acknowledged that he had originally given detectives a different story. He said that he did this because he was scared. Gray also testified that he gave the detectives the clothes that he had been wearing when he was at the mall with C.R., but that he never gave them the shorts or the shoes that he wore to her house later that night. Gray testified that those shorts had C.R.'s menstrual blood on them and that his shoes smelled bad so he had put them in a bag. Gray stated that those shorts and shoes were both in a bag "wherever [his] brother had moved to."

The jury convicted Gray of first-degree premeditated murder, rape, and aggravated burglary. It found him not guilty of aggravated criminal sodomy.

The district court sentenced Gray to life in prison without the possibility of parole for 50 years for the murder conviction. The court also imposed a consecutive 267-month prison sentence for the rape and a consecutive 34-month prison sentence for the aggravated burglary.

Gray appealed directly to this court.

7

*Identical Offenses*

Gray claims the district court should have sentenced him for intentional second-degree murder even though he was convicted of first-degree premeditated murder. Gray asserts that these crimes are identical offenses and points out that, under the identical offense doctrine, a court can only sentence him based on the offense that carries a lower sentence.

Gray did not raise his identical offense argument in the district court. Generally, this court will not consider legal theories that were not raised in the courts below. *State v. Perkins*, 310 Kan. 764, 768, 449 P.3d 756 (2019); *Pierce v. Board of County Commissioners,* 200 Kan. 74, 80-81, 434 P.2d 858 (1967).

Gray argues that this court can consider his claim for the first time on appeal for two reasons: (1) K.S.A. 2019 Supp. 21-6820(e)(3) "confers appellate courts with jurisdiction to review claims that a sentencing court erred in ranking the crime severity level of a defendant's conviction" and (2) an exception applies here because "identical offense challenges are purely legal issues."

Gray's statutory argument fails. K.S.A. 2019 Supp. 21-6820(e)(3) provides:

> "In any appeal from a judgment of conviction, the appellate court may review a claim that . . . the sentencing court erred in ranking the crime severity level of the current crime or in determining the appropriate classification of a prior conviction or juvenile adjudication for criminal history purposes."

8

Gray is not challenging the classification of the crime of conviction—he's challenging the district court's authority to sentence him based on the crime of conviction. Because he does not challenge the classification of his crime of conviction, this statute does not support his argument that we must review his unpreserved claim for the first time on appeal.

Gray next urges us to review his claim under an exception to the preservation rule. He correctly points out that we sometimes choose to do this when at least one of the circumstances identified in *Perkins* is present: (1) "[t]he newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case"; (2) consideration of the question is "necessary to serve the ends of justice or to prevent the denial of fundamental rights"; or (3) the judgment of a trial court should be upheld on appeal as "right for the wrong reason." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Gray insists that the first exception applies because his claim presents a legal question.

The decision to review an unpreserved claim under an exception is a prudential one. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017); *State v. Frye*, 294 Kan. 364, 369, 277 P.3d 1091 (2012). Even if an exception would support a decision to review a new claim, we have no obligation to do so. *Parry*, 305 Kan. at 1192.

We decline to utilize any potentially applicable exception to review Gray's new claim. Gray had the opportunity to present his arguments to the district court and failed to do so. This failure deprived the trial judge of the opportunity to address the issue in the context of this case and such an analysis would have benefitted our review. We therefore decline to address Gray's new arguments on appeal.

9

*K.S.A. 60-455 Evidence*

Gray argues the district court erred when it admitted evidence of prior crimes under K.S.A. 60-455 because the prejudicial effect of that evidence outweighed its probative value.

> "When admitting prior crime evidence under K.S.A. 2015 Supp. 60-455, the district court first determines whether the fact to be proven by the evidence is material, then considers whether the evidence is relevant to a disputed fact, and, finally, decides whether the probative value of the evidence outweighs the potential for undue prejudice. *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014). . . . An appellate court reviews this decision for an abuse of discretion. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). 'A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based.' *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014)." *State v. Perez*, 306 Kan. 655, 670, 396 P.3d 78 (2017).

Evidence of prior crimes or civil wrongs is generally "inadmissible to prove such person's disposition to commit crime or civil wrong." K.S.A. 2019 Supp. 60-455(a). However, this evidence "is admissible when relevant to prove . . . motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." K.S.A. 2019 Supp. 60-455(b). And under K.S.A. 2019 Supp. 60-455(d), when "the defendant is accused of a sex offense . . . , evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

10

At trial, the State offered evidence of a rape that Gray allegedly committed in 2013. The district court admitted this evidence under K.S.A. 60-455 after concluding that the evidence was "probative of the material fact it is admitted to prove, i.e. the defendant's propensity to commit violent acts of rape" and that the probative value outweighed its prejudicial effect. The court found that the similarities between the alleged 2013 incident and the alleged rape in this case, the corroborating testimony of the sexual assault nurse, and the State's limited ability to prove that C.R. did not consent to sexual activity made the evidence highly probative. It also pointed out that the jury would receive a limiting instruction directing it to consider the evidence only when deliberating on the rape and criminal sodomy charges.

The jury received the following limiting instruction:

"Evidence has been admitted tending to prove that the defendant committed a crime other than the present crime charged. As to the crimes of Rape and Aggravated Criminal Sodomy, this evidence may be considered by you solely as evidence of the Defendant's intent. You may not consider this evidence for any purpose as to the crimes of Murder in the first Degree and Aggravated Burglary.

"It is for you alone as the jury to determine what weight to give this evidence in determining whether the State of Kansas has met its burden of proving all elements of the crimes of Rape and Aggravated Criminal Sodomy beyond a reasonable doubt."

The parties agree that as a result of this instruction, the evidence was admitted for the sole purpose of proving Gray's intent to commit rape and aggravated criminal sodomy.

11

Gray appears to acknowledge that the evidence was material and relevant to a disputed fact. He argues only that the district court abused its discretion when it concluded that the evidence was more probative than prejudicial. Gray insists that no juror would have been able to follow the limiting instruction and, consequently, the prejudicial effect of the evidence on the murder charge outweighed its probative value with regard to the sex crime charges.

We find no error. Gray fails to offer any supporting authority or explanation for his belief that the jury was incapable of following the district court's limiting instruction. To the contrary, as the district court noted, we presume jury members follow instructions. See *State v. Seba*, 305 Kan. 185, 204, 380 P.3d 209 (2016) (citing cases that support this notion). And in *State v. Perez*, we signaled our confidence in a jury's ability to consider prior sex crimes evidence when deliberating on a sex crime charge and to disregard it when considering a murder charge. In *Perez*, the defendant was charged with sex and non-sex offenses. The district court admitted evidence of the defendant's previous sex crimes and instructed the jury that "[e]vidence ha[d] been admitted tending to prove that the defendant committed crimes of a sexual nature, other than the present sex crime charged" and that the jury could consider such evidence "'solely for the purpose of proving the relationship of the parties and defendant's motive, intent, preparation, plan, knowledge, propensity, absence of mistake or accident.'" 306 Kan. at 674. *Perez* argued that the limiting instruction should have explicitly limited the jury's consideration of propensity evidence to his propensity to commit the sex offense. We held that the instruction was not clearly erroneous because it "dealt only with evidence of previous sex crimes, referenced only 'the present sex crimes charged,' and was offered between two instructions that dealt with prior crimes of an entirely different nature." 306 Kan. at 674.

12

Because we presume jury members follow instructions, including limiting instructions regarding the admission and use of prior crimes evidence, and Gray fails to offer any facts or legal authority suggesting otherwise, his claim fails. We find no error in the admission of the prior sex crime evidence.

*Jury Instructions*

Finally, Gray argues that the district court erred when it did not instruct the jury on intentional second-degree murder as a lesser included offense of first-degree murder.

We have regularly reiterated the applicable standard of review for jury instruction issues:

"'We must first decide whether the issue has been preserved. Second, we analyze whether an error occurred. This requires a determination of whether the instruction was legally and factually appropriate. We exercise unlimited review of those questions. Next, if we find error, we conduct a "reversibility inquiry."' *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 [2012]).

"The standard for the reversibility inquiry depends on whether the instruction was properly requested in district court. If it was requested, the failure to offer it to the jury is grounds for reversal unless the State shows there is no reasonable probability the absence of the error would have changed the jury's verdict. *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492 (2019); *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). If the instruction was not requested, this court applies a clear error standard to the reversibility inquiry. 'Under that standard, an appellate court assesses whether it is "firmly convinced that the jury

would have reached a different verdict had the instruction error not occurred."' *Williams*, 308 Kan. at 1451 (quoting *Williams*, 295 Kan. at 516). The burden to establish clear error is on the defendant. In examining whether a party has met its burden, we consider the entire record de novo. See *Williams*, 308 Kan. at 1451." *State v. Gentry*, 310 Kan. 715, 720-21, 449 P.3d 429 (2019).

Gray concedes that he did not request this instruction in the district court. Therefore, we review for clear error. Because second-degree intentional murder is a lesser included offense of premeditated first-degree murder, it would have been legally appropriate. *Gentry*, 310 Kan. at 721.

The parties disagree about whether a second-degree intentional murder instruction was factually appropriate. Even assuming error, we conclude it was harmless and, therefore, not reversible.

First-degree premeditated murder requires "the killing of a human being committed . . . [i]ntentionally, and with premeditation." K.S.A. 2015 Supp. 21-5402(a)(1). Intentional second-degree murder requires "the killing of a human being committed . . . [i]ntentionally." K.S.A. 2015 Supp. 21-5403(a)(1). The only difference between the two is premeditation.

"Premeditation 'means to have thought the matter over beforehand,' meaning 'to have formed the design or intent to kill before the act.'" *State v. McLinn*, 307 Kan. 307, 321, 409 P.3d 1 (2018) (quoting *State v. Hebert*, 277 Kan. 61, 88, 82 P.3d 470 [2004]). We generally consider several factors when deciding whether the State offered evidence of premeditation: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the

14

defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" *McLinn*, 307 Kan. at 326 (quoting *State v. Knox*, 301 Kan. 671, 681, 347 P.3d 656 [2015]).

There was strong evidence of premeditation in this case. The State submitted evidence that someone broke through C.R.'s window to enter her house, stabbed her 37 times, and then attempted to clean up the crime scene. Gray admitted being in C.R.'s residence on the night of her murder and could not turn over some of the clothes that he wore to her house. This all strongly supports a jury finding of premeditation. See *State v. Blansett*, 309 Kan. 401, 417, 435 P.3d 1136 (2019) (evidence of several stab wounds can support premeditation); *State v. Scott*, 271 Kan. 103, 110, 21 P.3d 516 (2001) (evidence defendant slashed victim's throat as or after victim died, mopped up crime scene, and destroyed evidence supported finding of premeditation); *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002) (multiple blows to victim supported finding of premeditation).

In light of the overwhelming evidence of premeditation, we are not firmly convinced that the jury would have reached a different verdict had the district court offered an instruction on intentional second-degree murder. The absence of such an instruction was not clear error.

Affirmed.

MICHAEL E. WARD, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Ward was appointed to hear case No. 117,747 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.