IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,371

STATE OF KANSAS,
*Appellee*,

v.

STEPHEN A. GENTRY,
*Appellant*.

SYLLABUS BY THE COURT

1.

An aider or abettor cannot be guilty of a crime if the primary actor did not have the requisite mental state of the crime.

2.

Attempted unintentional but reckless second-degree murder and attempted reckless involuntary manslaughter are not recognized offenses in Kansas.

3.

Under K.S.A. 2018 Supp. 21-5202(c), the State can establish that a defendant acted recklessly if it proves that the defendant acted knowingly or intentionally. But the statute does not create logically impossible criminal offenses.

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed September 20, 2019. Convictions affirmed and restitution vacated in part.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

1

*Ellen Hurst Mitchell*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury convicted Stephen Gentry of first-degree murder, attempted first-degree murder, criminal discharge of a firearm at an occupied vehicle, and conspiracy to commit aggravated battery. We affirm Gentry's convictions but vacate in part the restitution order.

FACTUAL AND PROCEDURAL BACKGROUND

Gentry's convictions arose from a shooting that occurred late in the evening on May 6, 2015, resulting in the death of A.S. The events that led to the shooting began a day earlier. On May 5, 2015, Gentry lived with his girlfriend, Kaylee Ovalle. That evening, Ovalle called the police after having an altercation with Gentry. When an officer responded to the call, Gentry was gone, and attempts to locate Gentry failed. Ovalle stayed with her grandmother that night.

Earlier on May 6, 2015, Ovalle contacted her mother, Amber Ovalle, and asked her to help collect some of Ovalle's belongings from the apartment. Amber's boyfriend, Chad Bennett, and Bennett's coworker, Anthony Darby, agreed to accompany them. Around 5 p.m., Bennett picked up Amber and Darby and drove to Ovalle and Gentry's apartment. Bennett was driving a green Dodge pickup truck. This truck belonged to Amber's father, but, in May of 2016, Ovalle usually drove the truck. Ovalle was at the apartment getting her clothes and other things together when Bennett, Darby, and Amber arrived.

2

Around the same time that day, Gentry was with his friend Daniel Sims in Sims' apartment, which was across the hall from the apartment Gentry and Ovalle shared. A friend of Gentry's, Andrew Woodring, showed up at Sims' apartment. Macio Palacio, who was a friend of Woodring's, and Palacio's girlfriend, Azucena Garcia-Ferniza, were with Woodring. While they were all at Sims' apartment, Palacio showed Woodring and Gentry a gun. At trial, Sims would describe it as a "Glock .45." After about 30 minutes, Woodring, Palacio, and Garcia-Ferniza left Sims' apartment. After they left, Gentry and Sims went across the street to a Kwik Shop. They stayed there for 10 to 15 minutes and then left to return to the apartment complex.

Bennett and Darby were standing outside of Ovalle and Gentry's apartment when Gentry and Sims returned from the Kwik Shop. The men yelled at each other and eventually Darby hit Gentry in the face and broke Gentry's glasses. They separated and Bennett, Darby, Amber, and Ovalle left in the green pickup truck.

After the altercation, Gentry and Sims went to Jerome Forbes' apartment. Forbes and his girlfriend were both at the apartment. Gentry was upset about getting hit in the face. He called Woodring and told him he wanted to get revenge and asked him to come over and bring Palacio's gun. Gentry would later tell detectives that he wanted the gun there because, during a fight, there is always someone who stands in the back with a gun. According to Gentry, this way your adversaries know that if they pull out a gun, the other side will also pull out a gun. Gentry stated that "the only way it would have turned into a gun fight is if they pulled one out and fired." Gentry said that this is basic knowledge, but since he did not know Palacio, he could not confirm that Palacio knew that he was just supposed to stand guard with a gun.

While the men were waiting for Woodring to arrive, they discussed jumping Bennett and Darby and whether they would bring rolls of quarters or a baseball bat to the

3

fight. Sims would later testify that when Woodring and Palacio arrived, he saw the bulge of a handgun in Palacio's waistband and, regarding the handgun, Palacio told Gentry, "I got that." According to Sims, Gentry replied, "Okay." Gentry would later tell detectives that Palacio did not take out his gun but that he knew Palacio had the gun. Gentry told Palacio and Woodring that three or four individuals jumped him and that he wanted to go to Amber and Bennett's house to fight them. He said that no one had to go with him, but Sims, Forbes, Palacio, and Woodring all left the apartment with Gentry. Woodring drove. Sims would later testify at trial that fighting "was the goal, plan of that night."

Gentry directed Woodring to the house where Amber and Bennett lived. During the drive, Gentry was still angry and said that he was not going to let "[t]hem get away with hitting him in the face." Gentry told Woodring to park the car a block away so that no one would see their car. The five men got out and walked toward Amber and Bennett's house. When they saw that no lights were on in the house, they determined no one was home and began to walk back to the car.

Gentry generally agrees with the facts up to this point. From here, Sims' and Gentry's stories diverge. Sims testified for the State and confirmed that the charges against him had been reduced to involuntary manslaughter in exchange for his testimony. Sims testified that when they got back to the car, the following events took place: Gentry was telling the men that he wanted to wait for Bennett and Darby to come to the house when they all noticed a truck driving down the road toward them. Woodring was standing in the street by the driver's side of the car, and Sims, Forbes, Palacio, and Gentry were standing on the passenger side of the car in the grass. Gentry said they should wait and see what the truck was going to do. The street was dark, but Sims saw two people in the truck. The truck slowed down as it passed by the men standing by the car because the street was narrow. When the truck was 5 to 10 feet beyond the men, Gentry commanded

4

Palacio to shoot. Palacio stepped into the street and started shooting as Gentry got into the car. Sims heard five shots and then ran. Forbes followed him.

Gentry described the event differently. In two video-recorded interviews with detectives, Gentry stated that after he and the other men returned to the car, he climbed into the back seat by himself because Forbes and Sims had decided to walk home. Gentry then saw headlights coming toward the car. Someone told him that it was a truck. When the truck got closer, Gentry saw that is was not the truck that Ovalle drove. Gentry told Woodring and Palacio that it was "not the truck," but Woodring insisted that it was. Palacio, who had been about to get into the passenger's seat, stepped away from the car and toward the street. He asked Gentry if that was "the truck," and Gentry replied that it was not the truck. After the truck passed the men, Palacio asked Woodring if it was the truck and Woodring said that it was. Palacio then pulled out his gun and started shooting. Woodring then drove Palacio and Gentry to one of Woodring's friend's houses, and the three men separated.

Vince Johnson was driving the truck that drove past the men that evening. Johnson's girlfriend, A.S., was in the passenger seat of the truck. About 15 to 20 seconds after Johnson passed the car, he heard four to six gunshots and sped up. After driving away from the gunshots, he stopped the truck and noticed that A.S. had been hit. A.S. was transported to the hospital and died shortly after midnight on May 7, 2015.

Someone called the police at 9:27 p.m. on May 6, 2015, in regard to shots fired in the area where Woodring had parked the car. When the police investigated, they found five spent shell casings in the street. Johnson's truck had projectile holes in the tailgate and in the upper right-hand side of the back of the truck. The back window was shattered, and there was a bullet hole through the front passenger side headrest and a .45 caliber round on the dash.

5

The police eventually searched Palacio's home and found a Glock 30 semiautomatic .45 caliber handgun in the possession of Garcia-Ferniza. A firearm and tool mark examiner from the Sedgwick County crime lab would testify at trial that it was his opinion the fired bullet found in the dash of Johnson's truck and the fired cartridge cases found in the street were fired from that gun.

On May 11, 2015, the State charged Gentry with first-degree murder for the death of A.S., attempted first-degree murder for attempting to kill Johnson, criminal discharge of a firearm at an occupied vehicle, and conspiracy to commit aggravated battery. The State also charged Sims, Palacio, Forbes, Woodring, and Garcia-Ferniza in separate cases in connection with the events surrounding A.S.'s death.

Gentry's trial was scheduled for April 11, 2016. On March 25, 2016, Gentry moved for a continuance. He asserted that Palacio had retained a firearms expert who had not yet finished his report. Gentry wanted a continuance so he could depose and possibly retain the expert. The district court denied the motion and the case proceeded to trial.

At trial, the State conceded that Palacio fired the gun that killed A.S., but it argued that Gentry aided or abetted him by planning and fueling the entire encounter and directing Palacio to shoot. The State theorized that Gentry wanted to kill someone as revenge for being punched in the face.

The district court instructed the jury on two different theories of first-degree murder: premeditated and felony murder. It instructed the jury to consider intentional second-degree murder if it did not find Gentry guilty of first-degree murder. Regarding the attempted murder charge, the district court instructed the jury to consider attempted

6

intentional second-degree murder if it did not find Gentry guilty of attempted first-degree murder. Finally, the court instructed the jury on aiding and abetting and transferred intent.

The jury found Gentry guilty of all charges. While it unanimously agreed he was guilty of first-degree murder, it could not unanimously agree whether Gentry committed premeditated murder or felony murder. The jury checked a box on the verdict form allowing it to convict Gentry of first-degree murder although it did not agree on the underlying theory. Facts relating to the first-degree murder instruction and verdict form will be discussed in greater detail in the analysis of issues underlying the murder conviction.

After the jury returned its verdict, the State moved for restitution. The State asked for $3,642.05 for "trial preparation expense [and] witness expense" and $5,406.72 for "the Kansas Crime victim payment for medical and counseling for the parents."

The district court imposed a sentence of life imprisonment with a minimum of 25 years for the first-degree murder conviction, 253 months of imprisonment for the attempted first-degree murder conviction, 59 months of imprisonment for the criminal discharge of a weapon at an occupied vehicle conviction, and 6 months of imprisonment for the conspiracy to commit aggravated battery conviction. All sentences were to run consecutive, except for the 59 months, which would run concurrent to all other sentences. The court found that the offense was committed with a deadly weapon and ordered Gentry to register as a violent offender for a period of 15 years. Finally, the court ordered him to pay all of the requested restitution.

Gentry appealed to this court.

ANALYSIS

*Statutory error in jury instructions*

Gentry claims that the district court made a statutory error when it did not offer certain lesser included offense instructions on the first-degree murder charge and the attempted first-degree murder charge.

We review alleged instruction errors in a number of steps.

> "We must first decide whether the issue has been preserved. Second, we analyze whether an error occurred. This requires a determination of whether the instruction was legally and factually appropriate. We exercise unlimited review of those questions. Next, if we find error, we conduct a 'reversibility inquiry.'" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 [2012]).

The standard for the reversibility inquiry depends on whether the instruction was properly requested in district court. If it was requested, the failure to offer it to the jury is grounds for reversal unless the State shows there is no reasonable probability the absence of the error would have changed the jury's verdict. *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492, 498 (2019); *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016). If the instruction was not requested, this court applies a clear error standard to the reversibility inquiry. "Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Williams*, 308 Kan. at 1451 (quoting *Williams*, 295 Kan. at 516). The burden to establish clear error is on the defendant. In examining whether a party has met its burden, we consider the entire record de novo. See *Williams*, 308 Kan. at 1451.

8

*Lesser included offense instructions for first-degree murder charge*

At trial, the district court instructed the jury that it could find Gentry guilty of first-degree murder if the State showed that Gentry committed premeditated murder or felony murder, or both. It also instructed the jury that it could find him guilty of intentional second-degree murder if it did not find him guilty of first-degree murder. Gentry argues that it erred when it did not also instruct the jury on unintentional but reckless second-degree murder, reckless involuntary manslaughter, and voluntary manslaughter.

Gentry requested these instructions in the district court. Consequently, they were properly preserved and we move to the next question.

Our second task is to determine whether these requested instructions would have been legally appropriate. "An instruction on a lesser included crime is legally appropriate. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). And a lesser included crime includes a 'lesser degree of the same crime.' K.S.A. 2017 Supp. 21-5109(b)(1)." *State v. Pulliam*, 308 Kan. 1354, 1362, 430 P.3d 39 (2018). There are "five degrees of homicide. In descending magnitude, they are capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter." *Pulliam*, 308 Kan. at 1362. Under this hierarchy, second-degree murder, voluntary manslaughter, and involuntary manslaughter are lesser included offenses of first-degree premeditated murder.

Because the jury in Gentry's trial was instructed on first-degree premeditated murder, instructions on unintentional but reckless second-degree murder, reckless involuntary manslaughter, and voluntary manslaughter would have been legally appropriate.

9

The third step in our analysis is deciding whether these instructions would have been factually appropriate.

K.S.A. 2018 Supp. 22-3414 provides that, "[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 2018 Supp. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime." We recently reiterated that "'lesser included offense instructions must be given when there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that would reasonably justify a conviction of some lesser included crime.'" *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018) (quoting *State v. Seba*, 305 Kan. 185, 204, 380 P.3d 209 [2016]). However, a defendant's unsupported and self-serving statement of intent may not offer enough factual support for an instruction, depending "'on the extent to which the other evidence repudiates the statement.'" *Haygood*, 308 Kan. at 1409 (quoting *Seba*, 305 Kan. at 204).

We first consider whether an instruction on voluntary manslaughter was factually appropriate.

"Voluntary manslaughter is knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion . . . ." K.S.A. 2018 Supp. 21-5404. "Heat of passion" is "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *State v. Bernhardt*, 304 Kan. 460, 475, 372 P.3d 1161 (2016) (quoting [*State v.*] *Hayes*, 299 Kan. [861,] 864 [327 P.3d 414] [2014]).

> "'[T]o reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and causes that

10

person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.'" *Bernhardt*, 304 Kan. at 475-76 (quoting *Hayes*, 299 Kan. at 866).

Whether provocation was legally sufficient is based on an objective standard. *Bernhardt*, 304 Kan. at 475.

Under the principle of transferred intent, "'that [a] homicidal act was directed against one other than the person killed does not relieve the slayer of criminal responsibility. . . . [T]he guilt of the perpetrator of the crime is exactly what it would have been had the assault followed upon the intended victim instead of another.'" *Seba*, 305 Kan. at 193 (quoting *State v. Moffitt*, 199 Kan. 514, 535, 431 P.2d 879 [1967]*, overruled on other grounds by State v. Underwood*, 228 Kan. 294, 306, 615 P.2d 153 [1980]).

Under the aiding and abetting statute, "[a] person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 2018 Supp. 21-5210(a).

Gentry argues that this instruction was factually appropriate because the evidence shows he acted while filled with rage and seeking revenge after a physical altercation. We disagree.

In *State v. Wade*, 295 Kan. 916, 925-27, 287 P.3d 237 (2012), this court held that, even if there had been legally sufficient provocation, the facts did not support an instruction on voluntary manslaughter because the defendant's behavior showed a calculated act. He armed himself, had time to think on his drive to the scene of the crime,

and then had to devise a plan for gaining entry into the house where he shot the victim. 295 Kan. at 926.

In *State v. Henson*, 287 Kan. 574, 585, 197 P.3d 456 (2008), the facts did not support an instruction on voluntary manslaughter when the defendant did not react immediately after he was punched. Instead, he drove to his house, cleaned up, took his gun out, talked to his wife, introduced her to someone, drove to the scene of the crime, and pointed a gun at the victim as he said, "'What's up now, Randy?'" 287 Kan. at 586. The time between the punch and the shooting was around 20 to 30 minutes. This court noted that the defendant had taken "deliberate steps showing a plan to commit the shooting" and "engaged in activities that suggest control of his emotions and reason." 287 Kan. at 586.

Here, after Gentry was punched in the face, he had a significant amount of time to cool off before A.S. was shot. He spent that time calling friends, securing a gun, and deciding how to exact his revenge. He then drove to the house where he thought his intended victims would be and ultimately decided to retaliate another time when he saw the intended recipients were not home. After all of this occurred, Palacio then shot at a truck that was driving by. Like the actions of the defendants in *Henson* and *Wade*, these were deliberate. They were not the actions of a person who had lost control.

Moreover, even if the evidence would have supported a finding that Gentry was acting in the heat of passion when A.S. was killed, Gentry has not explained how it would have supported the same finding with respect to Palacio.

An aider or abettor cannot be guilty of a crime if the primary actor did not have the requisite mental state of the crime. See K.S.A. 2018 Supp. 21-5210(a) (directing when a person is liable for "a crime committed by another," thereby implying someone

12

else must commit all elements of the crime). This court's caselaw supports this understanding. See *State v. Doyen*, 224 Kan. 482, 490, 580 P.2d 1351 (1978) (considering aiding and abetting statute with operatively similar language when noting that "[t]he generally accepted rule is that a person cannot aid and abet the commission of a crime unless another commits the offense"); *State v. DePriest*, 258 Kan. 596, 603, 907 P.2d 868 (1995) ("In order to find the defendant guilty of aiding and abetting first-degree murder, the jury was required to find that a first-degree murder had been committed and that the defendant aided and abetted that murder with the intent to assist in its completion."); see also 21 Am. Jur. 2d, Criminal Law § 171 ("the actual perpetrator must have whatever mental state is required for each crime charged, while the aider and abettor must act with knowledge of the perpetrator's criminal purpose and with an intent or purpose either to commit, or to encourage or facilitate commission of, the offense").

Gentry does not argue that Palacio was acting in the heat of passion. In fact, Gentry focuses on only his state of mind with regard to this instruction. Consequently, Gentry has failed to show that an instruction on voluntary manslaughter as a lesser included offense of first-degree murder was factually appropriate here. The district court did not err when it declined to give that instruction.

Next, we consider whether instructions on unintentional but reckless second-degree murder and reckless involuntary manslaughter were factually appropriate.

Unintentional but reckless second-degree murder is "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2018 Supp. 21-5403(a)(2).

Reckless involuntary manslaughter is "the killing of a human being committed . . . [r]ecklessly." K.S.A. 2018 Supp. 21-5405(a)(1). "A reckless killing is one done under

13

circumstances showing a realization of the imminence of danger and a conscious disregard of that danger." *State v. McCullough*, 293 Kan. 970, 977, 270 P.3d 1142 (2012).

The required mental state for both crimes—unintentional but reckless—pertains to the intent to kill. "[A] deliberate and voluntary act can result in an unintentional but reckless killing if the specific intent to kill . . . is not proven." *State v. Deal*, 293 Kan. 872, 882, 269 P.3d 1282 (2012). The difference between unintentional but reckless second-degree murder and reckless involuntary manslaughter is "'the degree of recklessness required to prove culpability.'" *State v. Brown*, 300 Kan. 565, 588, 331 P.3d 797 (2014) (quoting [*State v.*] *Engelhardt*, 280 Kan. [113,] 135[, 119 P.3d 1148 (2005)]).

"Giving assistance or encouragement to one who it is known will thereby engage in conduct dangerous to life is sufficient for accomplice liability as an aider or abettor as to crimes defined in terms of recklessness or negligence." *State v. Garza*, 259 Kan. 826, 835, 916 P.2d 9 (1996).

In this case, the district court denied the request to instruct on the two forms of reckless homicide because "the evidence presented at the trial is that Palacio . . . appears to have aimed at [Johnson's truck] since he shot at it, actually shot through it." The court concluded that "was an intentional act as opposed to a reckless act, and . . . shooting a firearm into an occupied vehicle as it's being driven down the street right in front of where the defendant and codefendants were located is an intentional act as opposed to a reckless act."

The district court's analysis suffers from a legal flaw. In *Deal*, we explicitly held that a conviction for an unintentional but reckless killing "focuses culpability on whether a killing is intentional or unintentional, not on whether a deliberate and voluntary act

14

leads to death." 293 Kan. at 885. It is possible that the district court meant that Palacio's intentional act of shooting toward an occupied vehicle implied that Palacio was acting with an intent to kill. But the court did not include this finding in its ruling. According to the language in the trial transcript, the court considered only whether Palacio intended to shoot at an occupied vehicle, not whether he intended to kill its occupants.

In contrast, we consider whether the evidence would support a finding that Palacio acted without an intent to kill.

In *McCullough*, 293 Kan. at 979-80, this court held that the facts would not support a finding that the defendant acted without an intent to kill when the evidence showed that the defendant left a physical fight, immediately returned with a knife, and reached around another person to fatally stab the victim in the abdomen. This court came to the same conclusion in *State v. Clark*, 261 Kan. 460, 466, 931 P.2d 664 (1997). There, the defendant was convicted of first-degree murder. On appeal, he argued that the gun he had been holding accidently discharged and killed the victim. But the evidence showed that the gun was pressed against the victim's temple when the defendant fired it, that the gun had to be cocked prior to the shooting or by pulling the trigger, and that pulling the trigger to cock the gun would have required 13 pounds of pressure.

In *State v. Cavaness*, 278 Kan. 469, 101 P.3d 717 (2004), the evidence did not support an instruction on unintentional second-degree murder even when the defendant testified that he did not intend to kill the victim. The evidence showed that the defendant "struck the victim several times [with a baseball bat], called the neighbor for something to use to tie up the victim, and discussed with [other people] the fact that they could not let the victim leave for fear of retaliation." 278 Kan. at 477. Similarly, in *State v. Calderon*, 270 Kan. 241, 13 P.3d 871 (2000), the defendant testified that he had only intended to wound the victim in the arm when he stabbed him in the abdomen and killed

15

him. This court found no error in the district court's refusal to offer lesser included offense instructions on reckless homicide because the evidence showed a history of animosity between the defendant and victim and the defendant pulled out a knife and stabbed the victim after the victim had threatened to hit him. 270 Kan. at 242, 256.

This case provides a remarkably different factual scenario. There is very little evidence regarding Palacio's state of mind before and during the shooting. The evidence shows that Gentry called Woodring and asked him to bring Palacio's gun to a fight. Woodring arrived with Palacio, and Palacio may have then told Gentry, "I got that," in reference to his gun. Then, Gentry told all of his codefendants that he had been jumped and wanted to retaliate. According to both Gentry and Sims, Gentry told his codefendants none of them had to go with him, but they all decided to go. Gentry told officers that the gun was only there so Palacio could stand in the back and let their adversaries know that he would fire a gun if they fired first. But Gentry also said he did not know whether Palacio knew this was the reason for the gun. Gentry told detectives that Palacio shot toward the truck on his own accord after Woodring told Palacio it was the truck. Gentry did not know why Palacio shot toward the truck, and he told detectives that he thought Palacio was "psycho" for doing so. Sims' account differed only in his testimony that Gentry told Palacio to shoot. Sims and Gentry both insisted that there was no plan to kill anyone that night—that there was to be a fistfight only.

Contrary to the district court's ruling, we conclude that this evidence would have reasonably supported a finding that Palacio shot toward Johnson's truck without any intent to kill whoever might be inside but with extreme indifference to the value of human life or with a realization of the imminence of danger and a conscious disregard of that danger. See *State v. Cordray*, 277 Kan. 43, 56, 82 P.3d 503 (2004) (evidence sufficient to support conviction of unintentional but reckless second-degree murder when it showed defendant "fired into darkness in the direction of a vehicle that he knew was

16

occupied"); *State v. Perez*, 294 Kan. 38, 48, 261 P.3d 532 (2011) (noting that *Cordray* is good example of unintentional but reckless second-degree murder conviction where killing was committed unintentionally but recklessly).

This is not the end of our factual inquiry. We must also determine whether the evidence would support a finding that Gentry acted with the culpability of an aider or abettor to unintentional but reckless second-degree murder and reckless involuntary manslaughter. This would require a finding that Gentry gave assistance or encouraged Palacio in committing this crime while acting without an intent to kill but with the knowledge that Palacio would engage in conduct dangerous to life. See *Garza*, 259 Kan. at 835.

In his police interview, Gentry told detectives that he called Woodring and asked him to bring Palacio's gun so he could retaliate against the men who jumped him, but that the only "revenge" he wanted was to beat someone up. He also stated that he did not know why Palacio came with Woodring, that Palacio was supposed to stand in the back with his gun and only fire if someone else fired first, that he told Palacio the truck driving toward them was not "the truck," that Palacio fired his gun on his own accord, and that he did not know why Palacio fired his gun. Sims corroborated Gentry's assertion that the plan of the evening was to have a fistfight.

This evidence would reasonably justify a jury finding that Gentry acted without an intent to kill but with the knowledge that Palacio would engage in conduct dangerous to life when he gave assistance or encouraged Palacio in committing homicide. Although we have previously been reluctant to find that a defendant's uncorroborated self-serving testimony would alone support a lesser included offense instruction, we do not face that circumstance here. See *Haygood*, 308 Kan. at 1408-09. Sims' testimony corroborates Gentry's defense.

17

Accordingly, instructions on reckless second-degree murder and reckless involuntary manslaughter as lesser included offenses of first-degree premeditated murder were factually appropriate, and the district court erred when it declined to offer these instructions.

Our final step is a harmlessness inquiry. Because Gentry requested the instructions below, this error is harmless only if there is no reasonable probability the presence of the instruction would have changed the jury's verdict. As the party benefitting from the error, it is the State's burden to show us this error was harmless in light of the entire record. *Barrett*, 309 Kan. at 1037, 442 P.3d at 498.

The State argues that any error was harmless based on the skip rule. In *Barrett*, we described our original iteration of the skip rule: "'When a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured.'" 309 Kan. at 1037, 442 P.3d at 498 (quoting *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 [2004]).

*Barrett* further explained that more recent cases have clarified the skip rule is not a rule but "'a logical deduction that may be drawn from jury verdicts in certain cases.'" 309 Kan. at 1037, 442 P.3d at 499 (quoting *State v. Plummer*, 295 Kan. 156, 169, 283 P.3d 202 [2012]). We do not apply the deduction automatically or mechanically. Rather, it is "one factor, among many, to be considered as part of the applicable harmlessness test." *Barrett*, 309 Kan. at 1039, 442 P.3d at 499.

Relying on this reasoning, the State argues it is clear that any error in offering an instruction on the two forms of reckless homicide was harmless because the jury was instructed on second-degree murder and still convicted Gentry of first-degree murder.

The State charged Gentry with first-degree murder and introduced evidence that Gentry committed both premeditated murder and felony murder. The jury instructions directed the jury to "consider both theories in arriving at [its] verdict." The verdict form instructed the jury to first determine whether Gentry was guilty of first-degree murder and, if it did, to select one of the following three options:

> "Theory 1(a) We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of premeditated murder.
> . . . .
> "Theory 1(b) We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of felony murder.
> . . . .
> "Theory 1(c) We, the jury, unable to agree under Theory 1(a) or 1(b), do unanimously find the defendant guilty of murder in the first degree on the combined theories of premeditated murder and felony murder."

The jury found Gentry guilty of first-degree murder and selected theory 1(c), revealing that it was unable to unanimously agree whether Gentry committed premeditated murder or felony murder.

In most scenarios, the uncertainty created by the lack of a unanimous agreement on the theory supporting a verdict would preclude application of the skip rule. But the unique circumstances here allow application of this logical reasoning.

19

There is no question that if the jury had unanimously found Gentry guilty of first-degree premeditated murder, we would find the instructional error harmless under these facts. This is because, applying the logic of the skip rule, jurors would not have rejected intentional second-degree murder only to convict Gentry of reckless homicide. We have recently so held in very similar circumstances. See *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063, 1079 (2019) ("The jury found James guilty of first-degree murder, which required jurors to conclude not only that the killing was intentional but also premeditated. See K.S.A. 2018 Supp. 21-5402[a][1]. This verdict eliminates the possibility that the jury viewed the killing as merely reckless, and we can safely say there is no reasonable probability the judge's refusal to instruct on either or both reckless second-degree murder and involuntary manslaughter affected the outcome of the trial."). In this situation—when the jury split its guilty verdict between premeditated first-degree murder and first-degree felony murder—we conclude that with respect to those jurors who were convinced beyond a reasonable doubt that Gentry premeditated and intended a killing, the presence of the intentional second-degree murder instruction shows there is no reasonable probability the jury verdict would have been affected by a reckless homicide instruction.

This leaves those jurors who concluded beyond a reasonable doubt that Gentry was guilty of first-degree felony murder. These jurors could have never considered a lesser included offense because felony murder has no lesser included offenses. See *State v. Love*, 305 Kan. 716, 729-30, 387 P.3d 820 (2017) (finding no error in the trial court's failure to give a lesser included offense instruction for felony murder because K.S.A. 2015 Supp. 21-5109(b)(1) constitutionally eliminated lesser included offenses for felony murder); *State v. Dupree*, 304 Kan. 377, 400, 373 P.3d 811 (2016) (holding lesser included offense instructions for felony murder were legally inappropriate because felony murder has no lesser included offenses); *State v. De La Torre*, 300 Kan. 591, 601-02, 331 P.3d 815 (2014) (rejecting statutory mandate to give lesser included offense instructions under K.S.A. 22-3414[3] in felony-murder case because of legislative decision to

20

eliminate lesser included offenses of felony murder). As with premeditated first-degree murder, if the jury had unanimously found Gentry guilty of first-degree felony murder, we would not be reversing based on the failure to instruct on lesser included offenses.

There is no reason our harmlessness inquiry should change here just because some jurors chose differing theories of first-degree murder. The combined theories upon which the jury unanimously found Gentry guilty of first-degree murder were not affected by the absence of the lesser included reckless homicide instructions. Therefore, we conclude that there is no reasonable probability the presence of the requested reckless homicide instructions would have changed the jury's verdict. `As a result, any error based on the absence of the requested instructions was harmless in light of the entire record.

*Lesser included offense instructions for the charge of attempted first-degree murder*

Gentry was also charged with and convicted of the attempted first-degree murder of Johnson. He argues the district court clearly erred when it did not instruct the jury on attempted unintentional but reckless second-degree murder, attempted reckless involuntary manslaughter, and attempted voluntary manslaughter for this charge.

Gentry concedes that he did not request these instructions in the district court. Therefore, we will review any error for clear error.

We must again determine whether these instructions were legally appropriate. First we consider attempted unintentional but reckless second-degree murder and attempted reckless involuntary manslaughter.

21

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2018 Supp. 21-5301.

In *State v. Shannon*, 258 Kan. 425, 428, 905 P.2d 649 (1995), this court held that neither attempted unintentional but reckless second-degree murder nor attempted reckless involuntary manslaughter are recognized offenses in Kansas. We recently reaffirmed that decision in *Louis*, when we concluded that it was not legally appropriate to offer a lesser included offense instruction on reckless involuntary manslaughter because "attempt requires specific intent to commit the object crime, so 'to establish the crime of attempted involuntary manslaughter the person would be required to specifically intend to commit an unintentional crime[, and] [t]his is a logical impossibility.'" *Louis*, 305 Kan. at 461-62 (quoting *State v. Collins*, 257 Kan. 408, 419, 893 P.2d 217 [1995]).

This is still true. To commit attempted unintentional but reckless second-degree murder or attempted reckless involuntary manslaughter, Gentry would have had to attempt to kill someone while not intending to kill someone. As we said in *Shannon* and *Louis*, this is a logical impossibility—a person cannot intend to kill while not intending to kill.

Gentry argues that *Louis* and *Shannon* were decided incorrectly based on his reading of K.S.A. 2018 Supp. 21-5202(c). K.S.A. 2018 Supp. 21-5202(c) provides that

> "[p]roof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally."

22

Gentry asserts that the lesser included offense instructions were appropriate under this statute because it provides that "[i]f recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally." K.S.A. 2018 Supp. 21-5202(c).

We considered the same argument in *Louis* and found it unpersuasive. The statute makes clear that the State can establish that a defendant acted recklessly if it proves that the defendant acted knowingly or intentionally. But the statute does not create logically impossible criminal offenses.

Because attempted unintentional but reckless second-degree murder and attempted reckless involuntary manslaughter are not recognized offenses, they were not legally appropriate and the district court did not err when it declined to instruct the jury on them as lesser included offenses.

Our conclusion is different with regard to an instruction on attempted voluntary manslaughter. It is a recognized offense in Kansas, and it is a lesser included offense of attempted first-degree murder. *State v. Gutierrez*, 285 Kan. 332, 344, 172 P.3d 18 (2007); *State v. Harris*, 293 Kan. 798, 806, 269 P.3d 820 (2012). Therefore, it was legally appropriate in this case, and we will consider whether it was also factually appropriate.

Gentry argues that the same facts that he believes made an instruction on voluntary manslaughter factually appropriate made an instruction on attempted voluntary manslaughter factually appropriate. We have already concluded that a voluntary manslaughter instruction was inappropriate under these facts because the evidence did not support a finding that Gentry acted in the heat of passion. Furthermore, Gentry failed to explain how the facts supported a finding that Palacio acted in the heat of passion. Consequently, an instruction on attempted voluntary manslaughter as a lesser included

23

offense of attempted first-degree murder was not factually appropriate and the district court did not err when it did not offer such an instruction.

*Rights to jury trial and due process and lesser included offense instructions*

Gentry argues that the district court violated his rights to a jury trial and to due process under the United States Constitution when it did not give the lesser included offense instructions that he argues for in this appeal. Although we determined there was no reversible statutory error in failing to offer the instructions at trial, its absence does not establish the absence of a constitutional violation.

Gentry concedes that he did not raise these constitutional arguments below. Generally, we do not consider arguments that appellants present for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Gentry urges us to review his claims, averring that this is necessary to serve the ends of justice and prevent the denial of a fundamental right. See *Godfrey*, 301 Kan. at 1043. Although Gentry invokes an exception to the preservation rule, we will not utilize that exception today. See *State v. Robinson*, 306 Kan. 1012, 1026, 399 P.3d 194 (2017) (declining invitation to review unpreserved arguments under exception).

*Motion for a continuance*

Eighteen days before trial began, Gentry moved for a continuance so he could depose or possibly retain the firearms expert in Palacio's case. The district court denied that continuance. Gentry argues on appeal that this denial violated his constitutional right to present a defense.

We review a district court's ruling on a motion for a continuance for an abuse of discretion. A district court abuses its discretion when:  (1) no reasonable person would

take the view adopted by the district court judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. We review de novo whether a ruling denied the defendant the right to present a defense. *State v. Lewis*, 299 Kan. 828, 846, 326 P.3d 387 (2014).

Under K.S.A. 22-3401, the district court may grant a continuance for "good cause."

In *Lewis*, the defendant moved for a continuance less than three weeks before trial, arguing he needed more time to prepare because a new attorney had been appointed to his case four months earlier and the State had recently prevailed on its motion to admit K.S.A. 60-455 evidence. The district court denied the motion. Eight days before trial, the defendant again sought a continuance, arguing that he needed more time because he had retained a laboratory to perform independent testing on DNA evidence and the results were potentially exculpatory. The district court again denied the continuance. This court affirmed the denial because it could not conclude that no reasonable person would agree with the trial court's decision "given the time available to the defense." 299 Kan. at 847-48; see also *State v. Snodgrass*, 252 Kan. 253, 264, 843 P.2d 720 (1992) (denial of continuance not abuse of discretion when defendant moved for a continuance two days prior to trial because defendant had opportunity to request DNA testing much earlier and he was solely responsible for the delay).

In *State v. Ly*, 277 Kan. 386, 392, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004), this court again affirmed the district court's denial of the defendant's motion for a continuance when the defendant sought more time to find a firearms expert who could rebut the State's ballistics report. This court's decision was based, in part, on its observation that it was the defendant's choice to wait until after seeing the State's report to find an expert. 277 Kan. at 389.

In *State v. Daigle*, 220 Kan. 639, 556 P.2d 400 (1976), the district court denied the defendant's motion for a continuance when he argued that he needed more time to secure two vital witnesses. This court affirmed that decision because the defendant could not guarantee that the witnesses would testify and was given the opportunity to present the witnesses' written testimony from a previous trial. 220 Kan. at 644.

Here, on March 25, 2016, Gentry moved for a continuance, arguing that he needed more time so he could depose and possibly retain Palacio's firearms expert. He asserted that the expert might be able to "show that Palacio's intent in shooting was reckless or aimless." The district court heard arguments on the motion on April 4, 2016. Gentry informed the court that he needed the continuance because the expert had not completed his report.

The district court denied the motion. It noted that they were a week away from trial and had subpoenaed all the witnesses. It also observed that a large number of jurors had already been summoned and that the jurors had completed their long-form questionnaires. The court pointed out that there had been time for Gentry to hire his own expert if he had thought it necessary. It reminded Gentry that it had allowed "quite a bit of time" for discovery before even the preliminary hearing and that months had passed since arraignment. The court informed Gentry that he was free to try to retain Palacio's expert in the week before trial. Trial began on April 11, 2016. The expert never testified in Gentry's case.

On appeal, Gentry argues that the continuance should have been granted because he diligently pursued Palacio's expert in the two weeks after the motion for continuance was denied and the expert's testimony was vital to his defense. He asserts that he renewed his motion for a continuance during the trial. Based on this assertion, he looks at factors

26

that this court has said a court should consider when a party requests a continuance *during* trial. See *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007). Then he applies to these factors facts that did not come into existence until after the district court denied his motion for a continuance.

Gentry's arguments do not conform to the record on appeal. The record indicates that Gentry requested a continuance only once, on March 25, 2016. And the district court heard arguments on that continuance on April 4, 2016. At that time, Gentry did not know if Palacio's expert would be helpful because he had not seen his report. Gentry did not know if the expert would be able to testify or even if he wanted him to testify. Based on this information, the district court denied the motion for a continuance. Gentry cannot now rely on facts that were not in existence when the district court made a decision to argue that the district court made an error.

Gentry's motion relied on speculation that the expert might be helpful to his case. Gentry could not say whether he would eventually want the expert to testify, let alone whether or when he could secure the expert's attendance. Consequently, we conclude that the district court did not abuse its discretion when it denied the continuance.

*Restitution*

Gentry argues that the district court erred when it ordered him to pay $3,642.05 in restitution to the Saline County Attorney's office for expenses related to witnesses and the preparation of photographic trial exhibits.

This court reviews the amount of a restitution award for an abuse of discretion. *State v. Holt*, 305 Kan. 839, 842, 390 P.3d 1 (2017). A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the trial judge; (2) a

ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *Lewis*, 299 Kan. at 846.

K.S.A. 2018 Supp. 21-6604(b)(1) provides that "the court shall order the defendant to pay restitution, which shall include, but not be limited to, damage or loss caused by the defendant's crime, unless the court finds compelling circumstances which would render a plan of restitution unworkable."

In *State v. Harley*, No. 93,349, 2005 WL 2665768, at *2 (Kan. App. 2005) (unpublished opinion), a panel of the Court of Appeals held that the State was not entitled to restitution because it was not a victim of the defendant's crime.

The State does not disagree with *Harley*. But it asserts that the court did not err when it ordered Gentry to pay the State's trial preparation expenses because that was an order for court costs, not restitution.

Under K.S.A. 22-3801(a), "[i]f the defendant in a criminal case is convicted, the court costs shall be taxed against the defendant and shall be a judgment against the defendant which may be enforced as judgments for payments of money in civil cases." K.S.A. 2018 Supp. 28-172a(d) provides:

> "All other fees and expenses to be assessed as additional court costs shall be approved by the court, unless specifically fixed by statute. Additional fees shall include, but are not limited to, fees for Kansas bureau of investigation forensic or laboratory analyses, fees for detention facility processing pursuant to K.S.A. 12-16,119, and amendments thereto, fees for the sexual assault evidence collection kit, fees for conducting an examination of a sexual assault victim, fees for service of process outside the state, witness fees, fees for transcripts and depositions, costs from other courts, doctors' fees and examination and evaluation fees."

28

In *State v. Alvarez*, 309 Kan. 203, 205-07, 432 P.3d 1015 (2019), we affirmed the Court of Appeals conclusion that expenses for photographic trial exhibits can be classified as court costs.

Consequently, the district court could have taxed Gentry for the photocopying and witness expenses as court costs. The district court order, however, specifically ordered these expenses to be reimbursed as "restitution."

We cannot simply ignore the district court's language; restitution and court costs are two different things. As previously mentioned, restitution is controlled by K.S.A. 2018 Supp. 21-6604 and court costs are subject to K.S.A. 22-3801 and K.S.A. 2018 Supp. 28-172a. When a defendant is incarcerated, restitution is due upon sentencing only if the court orders a certain amount of money be withheld from the defendant's monthly prison account. Otherwise, restitution orders at sentencing are advisory calculations of damages for the Prisoner Review Board, which can impose restitution upon the defendant's parole. *State v. Alderson*, 299 Kan. 148, 151, 322 P.3d 364 (2014). The taxation of court costs are not viewed in the same way. See *State v. Douglas*, 47 Kan. App. 2d 734, 742, 279 P.3d 133 (2012) (noting that, unlike restitution, court must order a convicted defendant to pay court costs even if defendant is going to prison).

The State insists that everyone understood that they were talking about court costs and not restitution, and therefore the order should be affirmed as an order for costs.

But everyone referred to the order for these expenses as a "restitution" order, and the sentencing order labels the expenses "restitution." Because the State does not contest the argument that the district attorney's office is not entitled to restitution, and because the parties and the order clearly label it as restitution, we conclude that the district court

made a legal error when it included $3,642.05 for witness and exhibit expenses in the restitution order. Because the order was based on a legal error, it was an abuse of discretion. We vacate that portion of the restitution order.

CONCLUSION

We affirm Gentry's convictions. We vacate $3,642.05 of the restitution order.

JOHNSON, J., not participating.