NOT DESIGNATED FOR PUBLICATION

No. 126,417

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE RICARDO AGUILAR-RAMOS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Submitted without oral argument. Opinion filed November 1, 2024. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, P.J., HILL and COBLE, JJ.

PER CURIAM: Jose Aguilar-Ramos appeals his convictions of several offenses. He argues that the district court should have instructed the jury about the limited ways it could consider evidence of other bad acts he had committed, and in the absence of such an instruction, the jury likely convicted him based on improper propensity evidence. After carefully reviewing the record and the parties' arguments, we are firmly convinced that the jury would not have reached a different verdict if the court had given a limiting instruction—which Aguilar-Ramos did not request. We thus affirm his convictions.

1

THE CONDUCT LEADING TO AGUILAR-RAMOS' CONVICTIONS

In January 2021, two girls approached their mother and told her that Aguilar-Ramos had been doing inappropriate things to them for the last two years. At the time, the girls—to whom we refer under the pseudonyms Jane and Mary—were respectively nine and seven years old. Aguilar-Ramos was eventually charged with two counts of statutory rape, two counts of aggravated indecent liberties with a child, and two counts of aggravated criminal sodomy.

At trial, the girls, their mother, and a nurse examiner who had conducted a sexual assault investigation all testified regarding what had occurred. The details of the girls' repeated encounters with Aguilar-Ramos need not be discussed here in great detail. But highly summarized, Aguilar-Ramos began living with the mother and her three daughters in 2018. At the time, Aguilar-Ramos worked as a roofer so he would often stay home, especially during the winter, and be responsible for the girls. In December 2020, the mother began noticing changes in Jane's and Mary's behavior. Around the same time, a babysitter approached the mother with similar concerns. Mary did not want to take showers, wanted to wear two sweaters at the same time, began eating less, and "became aggressive towards children," particularly boys. Jane's behavior also changed in "less suspicious" ways.

In January 2021, when Aguilar-Ramos was asleep in another room, Jane and Mary approached their mother together and told her they needed to tell her "something important." Jane told her mother that earlier that day, Aguilar-Ramos had sent Jane to clean the downstairs level of their two-story home and had taken Mary upstairs to his bedroom. A little while later, Aguilar-Ramos came downstairs, and Jane went upstairs to find Mary "without clothes." Jane asked Mary, "What are you doing?" Mary was "very scared and said nothing."

The mother testified that Jane told her Aguilar-Ramos would get Mary out of her bed and take her into his bed and that Jane "would hear [Mary] crying." On one occasion, Jane told her mother, she had "peek[ed] through" a hole in the primary bedroom's door and saw Aguilar-Ramos "lay [Mary] down on [the] bed" and "take her clothes off." Jane also told her mother that when Jane and Aguilar-Ramos were in the living room alone, Aguilar-Ramos had "[thrown] her to the floor and he was trying to kiss her."

The mother also testified that the girls told her Aguilar-Ramos began doing inappropriate things to them when she had traveled to Texas in March 2019 to pick up her sister. The girls said that, since then, Aguilar-Ramos would put his penis inside their vaginas, put his penis inside Mary's mouth, and had shown Mary a pornographic video of how to "'get the milk out'" of a man. The girls said inappropriate things would happen "[e]very time they stayed with him." And they told their mother that they had not told her about this earlier because Aguilar-Ramos had threatened to "cut their tongue[s]" and "hurt" their mother if they ever told anyone.

The mother testified that after learning what had been happening, she took her daughters to her sister's house next door and called 911. After the police arrived, Jane and Mary were taken to the Child Advocacy Center. At the center, Jane was interviewed by a detective; the detective was unable to interview Mary because her mother began having health concerns and was taken to the hospital. The girls went with their mother to the hospital, and while there, were examined by a sexual assault nurse examiner. The mother later took both girls back to the center to be interviewed by the detective. The State entered the recordings of Mary's and Jane's interviews into the record at trial.

The girls also testified extensively, and this testimony generally corroborated their mother's account. Jane testified that Aguilar-Ramos put his penis inside "where you go pee," inside her "butt," and inside her mouth. Jane said all these incidents happened when her mother was not home and that, when Aguilar-Ramos was doing these things to her,

3

he would tell her "to be quiet and don't talk." Jane also testified that Aguilar-Ramos had shown her videos on his phone of naked people kissing. And she said that Aguilar-Ramos would clean off the "milk" with a towel and put it in a plastic bag and hide it.

Jane also testified that she had seen Aguilar-Ramos "doing something bad" to Mary in their mother's room. Jane said she had looked through the hole in the bedroom door—where the doorknob should have been—and saw Aguilar-Ramos touching Mary's butt while both of their clothes were on. Aguilar-Ramos then began taking off his clothes and trying to take Mary's clothes off too. But Mary was trying to get away, and Aguilar-Ramos could not take Mary's clothes off. Jane also testified that Mary had told her that Aguilar-Ramos "was grabbing her" in her mother's room. Jane explained that she did not tell her mother about what happened after the first or second incident because Aguilar-Ramos had told her that he was going to "hit" her if she told anyone. And when her mother had asked her if anything inappropriate had happened, she had denied it. But after the third time, Jane told Mary that they should tell their mom "because it's bad" and she was "not thinking to be scared" anymore.

Mary also testified. She said that the first time something inappropriate happened was when her mother was in Texas and she and Jane were sleeping. She testified that she told her mother that Aguilar-Ramos had touched her "in [her] butt, and put his penis in [her] mouth" and "in [her] butt." These incidents would often occur in the mother's room or in the living room. Mary said that Aguilar-Ramos told her that if she told her mother, Aguilar-Ramos would "do something even more bad to [her]." But Mary said that she told her mother anyway because she "could not take that anymore."

The nurse examiner testified about what the girls had told her at the hospital, and this account—which largely came from Mary—was detailed and again consistent with the other testimony. She performed a sexual assault examination of Mary and did not note any injuries on Mary but noted there was "redness throughout [Mary's] labia

4

minora." Mary told the nurse that she was penetrated in the genitals by Aguilar-Ramos' penis and finger and was penetrated in the mouth by his penis.

During the investigation, police collected the clothes worn by Jane, Mary, and Aguilar-Ramos. Police also collected other clothing, Aguilar-Ramos' cellphone, and bedding that may have been involved in the incidents. And the mother later delivered a bag that she had found hidden in a closet that contained a mix of Aguilar-Ramos' and Mary's clothes with something that looked like semen on Aguilar-Ramos' clothes—all consistent with the girls' statements that Aguilar would hide their clothes in plastic bags after he had assaulted them.

After hearing the testimony and considering the other evidence presented, a jury found Aguilar-Ramos guilty of each of the crimes charged. The district court sentenced Aguilar-Ramos to life in prison without the possibility of parole for 25 years for each offense. The court ordered Aguilar-Ramos to serve the sentences for the crimes against each girl concurrently and then ran these two groups of sentences consecutive, for a controlling life sentence of 50 years without the possibility of parole.

AGUILAR-RAMOS' SOLE CHALLENGE:
THE ABSENCE OF A LIMITING INSTRUCTION

In his appeal, Aguilar-Ramos does not challenge any of this evidence. Instead, he argues that the district court should have provided a limiting instruction to the jury regarding the ways they could consider some of the evidence offered at trial, which he claims related to bad acts other than for the crimes charged. Aguilar-Ramos acknowledges that he did not request a limiting instruction or otherwise alert the court to his concern that the jury would convict him based on a perceived criminal propensity rather than on the other evidence presented. But he asserts that the absence of such an instruction calls into question the legitimacy of the verdict and the fairness of his trial.

5

When faced with a claim that an unrequested instruction should have been given at trial, we must determine whether the instruction was appropriate under the law and whether it fit the evidence presented. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). If so, we consider whether the district court's instructions require reversal. *State v. Gentry*, 310 Kan. 715, 720, 449 P.3d 429 (2019). A person raising an instructional deficiency for the first time on appeal, as Aguilar-Ramos is here, did not allow the district court the opportunity to assess whether the instruction should have been given in the first instance. *State v. Arreola*, 64 Kan. App. 2d 562, 566, 554 P.3d 684 (2024). Thus, the person raising the issue on appeal must demonstrate that the absence of the instruction was clearly erroneous—that is, they must firmly convince the appellate court that the jury would have reached a different verdict if the instruction had been given. K.S.A. 22-3414(3); *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

The instruction Aguilar-Ramos claims was missing here is an extension of the more general rule against propensity evidence—evidence showing a tendency to commit crimes in general, rather than showing the defendant committed the specific crimes charged. K.S.A. 2023 Supp. 60-455(a) directs that "evidence that a person committed a crime or civil wrong on a specified occasion . . . is inadmissible to prove such person's disposition to commit crime or civil wrong" to show that person had a propensity to commit another crime.

But despite this prohibition, evidence that a defendant committed a different crime or civil wrong may be admissible for other reasons. For example, such evidence may be relevant to prove some other material fact relating to the crime charged, like the defendant's intent, plan, or motive. See K.S.A. 2023 Supp. 60-455(b). And K.S.A. 60-455 does not prevent evidence of crimes or other civil wrongs if that evidence helps describe the acts or circumstances that gave rise to the crimes charged and discussed at trial. See

*State v. Butler*, 307 Kan. 831, 861, 416 P.3d 116 (2018); *State v. McDaniel*, 306 Kan. 595, 616, 395 P.3d 429 (2017).

Because this type of evidence may be admissible for some reasons but not others, a district court should instruct the jury about the limited ways the evidence can and cannot be considered. See *State v. Gunby*, 282 Kan. 39, 58, 144 P.3d 647 (2006). Courts call this admonition a limiting instruction. 282 Kan. at 58.

Aguilar-Ramos argues that the district court should have provided a limiting instruction when the State introduced three categories of evidence at trial: (1) evidence that Aguilar-Ramos had threatened to cut Jane's tongue and hurt the girls' mother if they told anyone what he did to them; (2) evidence that Aguilar-Ramos exposed himself to the mother's sister; and (3) evidence from a phone call Aguilar-Ramos made in jail when he stated he was being charged for "DUI." While we have discussed the first of these categories previously, the second and third require additional background.

The evidence relating to the mother's sister arose when the mother was describing how she lost trust and came to suspect Aguilar-Ramos. In December 2020, her sister had been cooking at the mother's house for a birthday party. When the sister began carrying the food to her house, which was right next door, she heard Aguilar-Ramos ask, "[A]re you leaving?" As the sister turned around to answer, she saw Aguilar-Ramos standing nearby, naked. Aguilar-Ramos did not object to this testimony at trial, but he now asserts that the mother had described conduct that a jury could treat as evidence of a propensity to commit sexual misconduct.

The third category of evidence involved a recorded phone call Aguilar-Ramos made from jail. During a break on the second day of trial, the prosecutor informed the court that she was about to present evidence of the phone call, which contained statements that could be considered "another bad act" that he had not been charged with.

7

In particular, the prosecutor said that Aguilar-Ramos had stated in the call that he was being charged with "'driving'" and "'DUI'" in addition to the other sex crimes. The prosecutor told the court that she had asked Aguilar-Ramos' counsel whether there was anything in the phone call that she needed to avoid, and he had said no. Aguilar-Ramos' counsel concurred, telling the court that he did not "find it objectionable" to admit the entire phone call without alteration because "we're talking about something so much more serious, and I don't believe that 'Oh, he maybe drinks and drives' is going to be a factor." The attorney was concerned that if the parties agreed to alter the phone call, the jury could infer that Aguilar-Ramos was hiding something worse than what had already been revealed.

The State then offered the entire recording of the phone call that Aguilar-Ramos made while in jail, and Aguilar-Ramos did not object to this evidence. The conversation was conducted exclusively in Spanish, and the State called a bilingual police officer as a witness to translate the conversation. The officer testified that during the call, which lasted around 14 minutes, Aguilar-Ramos was telling the other person that he needed money to get out of jail and go back to El Salvador. The person then asked Aguilar-Ramos about his charges, and Aguilar-Ramos said that he had been charged with "attempt rape, driving, touching the girl, and DUI." Aguilar-Ramos then said, "Everything about the girls is true. I fucked up." The other person responded, "Don't be saying stuff like that," and told him that all the jail calls are recorded.

The State disputes that any of this evidence was offered to show Aguilar-Ramos' criminal propensity; it argues that the evidence in each of these three categories was offered as part of the description of how people became aware of his crimes and the events surrounding his arrest and the investigation. We acknowledge that the parties' arguments concerning this evidence is hampered by the fact that Aguilar-Ramos did not contemporaneously object to the evidence nor alert the district court to his concerns. But a limiting instruction would have clarified the manner in which the evidence could have

8

been considered by the jury. See *Gunby*, 282 Kan. at 58. Thus, to the extent that this evidence concerned criminal activity or other wrongful behavior, a limiting instruction was both legally and factually appropriate.

That does not mean, however, that the absence of the instruction here necessitates a new trial. Indeed, even assuming that a limiting instruction was warranted, we are firmly convinced that the jury would have reached the same verdict even if such an instruction had been given.

Aguilar-Ramos claims that the absence of a limiting instruction caused the jury to call into question the integrity of the jury's verdict. He argues that a limiting instruction would have protected him against "the inappropriate propensity judgments that jurors would make," such as concluding that he was "guilty of the charged crimes on the basis that he was a criminal and a wrongdoer, and he should not be believed." Plus, Aguilar-Ramos argues, he had a strong defense based on "inconsistencies and [a] lack of physical evidence in the State's case." So, he concludes, if the court would have provided an appropriate limiting instruction, "there is a likelihood of a different verdict."

But we are not persuaded. The jury heard detailed testimony from both Jane and Mary about what Aguilar-Ramos had done. Jane testified that Aguilar-Ramos had put his penis inside the part "where you go pee," inside her anus, and inside her mouth. And Mary testified that Aguilar-Ramos "put his penis in [her] mouth" and "in [her] butt"; "put his tongue in" the part of her body "where you go potty"; and penetrated her genitals. This testimony was corroborated by the mother's explanation of what occurred and the nurse examiner's account of what she had learned from the girls.

The categories of evidence that Aguilar-Ramos challenges on appeal does not undermine the strength of these accounts. None of these alleged bad acts point specifically to Aguilar-Ramos' propensity to commit any of the charged crimes. And even

if there were some slight prejudice, we are convinced that its effect on the verdict was minimal considering Aguilar-Ramos' admission that "everything about the girls is true."

We are firmly convinced that the absence of a limiting instruction did not affect the outcome of Aguilar-Ramos' trial. We thus affirm his convictions.

Affirmed.